30 A.3d 1074

NEW JERSEY DIVISION OF YOUTH AND FAMILY
SERVICES, PLAINTIFF–RESPONDENT, v. T.I.,
DEFENDANT–APPELLANT.

IN THE MATTER OF THE GUARDIANSHIP OF S.L.M., A MINOR.

Superior Court of New Jersey
Appellate Division

Argued telephonically November 2, 2011—Decided November 28, 2011.

128

Before Judges YANNOTTI, ESPINOSA and KENNEDY.

*Mark E. Kleiman,* Designated Counsel, argued the cause for appellant (*Joseph E. Krakora,* Public Defender, attorney; *Mr. Kleiman,* on the brief).

*John W. Tolleris,* Deputy Attorney General, argued the cause for respondent (*Paula T. Dow,* Attorney General, attorney; *Melissa H. Raksa,* Assistant Attorney General, of counsel; *Lisa Landsman,* Deputy Attorney General, on the brief).

*Katherine J. Bierwas,* Designated Counsel, argued the cause for minor S.L.M. (*Joseph E. Krakora,* Public Defender, Law Guardian, attorney; *Ms. Bierwas,* on the brief).

The opinion of the court was delivered by

ESPINOSA, J.A.D.

In T.I.'s appeal from an order that terminated her parental rights to her daughter, S.L.M., we are asked to consider the definition of "feasible" under the Kinship Legal Guardianship

(KLG) statute, *N.J.S.A.* 3B:12A–1 to –7. We conclude that, when a caregiver in a case brought by the Division of Youth and Family Services (DYFS) unequivocally asserts a desire to adopt, the finding required for a KLG that "adoption of the child is neither feasible nor likely" cannot be met. For the reasons that follow, we affirm.

## I

S.L.M. was born to T.I. and M.M., Jr., on July 17, 2006. DYFS had an extensive prior history with T.I. that included the surrender of her parental rights to three older daughters, born between 1996 and 2002.[1] When T.I. was eight months pregnant with S.L.M., DYFS received an anonymous complaint that she was consuming alcohol and using drugs. An in-home plan was developed, following an investigation, that permitted S.L.M. to be discharged into T.I.'s care after she was born. Pursuant to the plan, T.I. submitted to a substance abuse evaluation and treatment, met periodically with DYFS caseworkers for several months, and sporadically attended parenting classes and received therapy.

In December 2006, when S.L.M. was approximately six months old, T.I. admitted to feeling depressed and having a history of mental health problems. DYFS arranged for a psychological evaluation and additional counseling sessions. T.I. successfully completed one round of parenting classes and began attending additional classes.

A DYFS caseworker met with T.I. following an anonymous report in April 2007. The caseworker observed extensive burns on S.L.M.'s feet, legs and buttocks. T.I. claimed she did not know how S.L.M. was burned but believed it was a result of hot bath water. She admitted she did not seek medical care because she feared S.L.M. would be removed from her care. An emergency

---

[1] The custody and care of the three older daughters is not at issue in this appeal.

removal was effected under *N.J.S.A.* 9:6–8.29 and *N.J.S.A.* 9:6–8.30. S.L.M. was treated at a hospital and discharged to the care of her paternal grandfather, M.M., and his wife (collectively, the paternal grandparents), who later expressed their desire to adopt S.L.M.

DYFS filed a verified complaint and order to show cause alleging that T.I. inflicted harm on S.L.M. DYFS was granted custody and supervision of S.L.M. based on a finding that S.L.M. was at risk of imminent harm. A complaint for guardianship of S.L.M. was filed in June 2009, seeking the termination of T.I.'s parental rights.[2] After a trial, the trial court entered a judgment terminating T.I.'s parental rights and ordering a summary hearing as to the status of the adoption.

This appeal followed.

## II

A trial court's decision to terminate parental rights is subject to limited appellate review. *N.J. Div. of Youth & Family Servs. v. G.L.*, 191 *N.J.* 596, 605, 926 *A.2d* 320 (2007). If supported by "adequate, substantial, and credible evidence in the record[,]" the trial court's findings of fact are entitled to deference. *Ibid.*; *see also Cesare v. Cesare*, 154 *N.J.* 394, 413, 713 *A.2d* 390 (1998) ("Because of the family courts' special ... expertise in family matters, appellate courts should accord deference to family court factfinding."). The family court's decision to terminate parental rights will not be disturbed "when there is substantial credible evidence in the record to support the court's findings." *N.J. Div. of Youth & Family Servs. v. E.P.*, 196 *N.J.* 88, 104, 952 *A.2d* 436 (2008).

---

[2] The complaint also sought the termination of the parental rights of S.L.M.'s biological father, M.M., Jr. During the trial of this matter, he voluntarily surrendered his parental rights. The court approved the surrender and the trial proceeded solely as to T.I. M.M., Jr. is not a party to this appeal.

■ *N.J.S.A.* 30:4C–15.1(a) governs the termination of parental rights in the "best interests of the child." Before parental rights may be terminated, DYFS must satisfy the following four criteria by clear and convincing evidence:

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[*N.J.S.A.* 30:4C–15.1(a).]

*See G.L., supra,* 191 *N.J.* at 606, 926 *A.*2d 320; *N.J. Div. of Youth & Family Servs. v. A.W.,* 103 *N.J.* 591, 611–12, 512 *A.*2d 438 (1986) (adopting clear and convincing standard as minimum required by Fourteenth Amendment).

The trial court found that DYFS had satisfied each of these prongs by clear and convincing evidence. T.I. does not challenge the sufficiency of the evidence to establish that (1) she endangered S.L.M.'s safety, health or development, and (2) she is unable to eliminate the harm facing the child or provide a safe and stable home for the child and the delay of permanent placement will add to the harm.

As to the third factor, the trial court found that DYFS offered T.I. sufficient services to eliminate potential harm to S.L.M. and that T.I. failed to comply with the services provided. Further, the trial court considered and rejected KLG as a permanent arrangement because T.I. and the paternal grandparents did not have a sufficient level of cooperation.[3]

---

[3] T.I.'s argument that the trial court failed to consider KLG is, therefore, without merit.

As to the fourth prong, the trial court cited expert testimony that S.L.M. is strongly bonded to her paternal grandparents, who were deemed her psychological parents. The court observed that, although T.I. was briefly compliant with services rendered to her, she had reverted to selling drugs, sporadic visits and the inconsistency in her conduct that "has delayed permanency for this child for so long." The court found the evidence clear that T.I. "does not have the tools or skills to remediate the harm that would occur if this child were removed" from the paternal grandparents. In contrast, the court found it clear that the paternal grandparents were equipped "to remediate any harm that would occur" if S.L.M.'s bonds with T.I. were broken. The court therefore concluded that DYFS had proven, by clear and convincing evidence, that it will not do more harm than good to terminate the parental rights of T.I. to S.L.M.

T.I.'s challenge to the trial court's determination that the third and fourth prongs of the analysis were satisfied rests primarily upon an argument that KLG pursuant to *N.J.S.A.* 3B:12A–1 to –7, rather than termination, was appropriate here. We disagree.

### III

The third factor "requires DYFS to undertake diligent efforts to reunite the family." *K.H.O., supra,* 161 *N.J.* at 354, 736 *A.*2d 1246 (citing *N.J.S.A.* 30:4C–15.1(a)(3)). Additionally, alternatives must be considered before deciding to terminate parental rights. *N.J.S.A.* 30:4C–15.1(c). The pre-requisites for KLG, the alternative T.I. argues for, are set forth in *N.J.S.A.* 3B:12A–6(d):

The court shall appoint the caregiver as a kinship legal guardian if, based upon clear and convincing evidence, the court finds that:

(1) each parent's incapacity is of such a serious nature as to demonstrate that the parents are unable, unavailable or unwilling to perform the regular and expected functions of care and support of the child;

(2) the parents' inability to perform those functions is unlikely to change in the foreseeable future;

(3) in cases in which the division is involved with the child as provided in subsection a. of section 8 of *P.L.*2001, c. 250 (C.30:4C–85),

(a) the division exercised reasonable efforts to reunify the child with the birth parents and these reunification efforts have proven unsuccessful or unnecessary; and

(b) adoption of the child is neither feasible nor likely; and

(4) awarding kinship legal guardianship is in the child's best interests.

T.I. does not contest her incapacity to care for S.L.M. or that it is unlikely such inability will change in the foreseeable future. Her challenge focuses on subsection 3(b). Despite M.M.'s unwavering position that he and his wife wanted to adopt the child, T.I. argues that adoption of the child is neither feasible nor likely and therefore, KLG, rather than adoption, was appropriate. This argument depends upon the application of a definition of "feasible" that is unsupported by the legislative findings accompanying the Kinship Legal Guardianship Act, and which we reject.

As T.I. notes, "feasible" is not "expressly" defined in the KLG statute. She concedes that M.M.'s expressed desire to adopt S.L.M. satisfies one dictionary definition, "[c]apable of being done, executed or effected; possible of realization[.]" *See Webster's New International Dictionary* 926 (2d ed.1939). However, she argues,

[T]he Legislature must have intended that "feasible" mean something more than merely "capable of being done, executed or effected or realized." To hold otherwise might render Section (d)(3) of *N.J.S.A.* 3B:12A–6 discordant with Section (d)(4), which mandates that the *adoption* be in the child's best interest. One could clearly envision circumstances where an *adoption* is legally or logistically "capable of being done," but not in the child's best interests and, as such, contrary to the Act's very purpose.

[ (Emphasis added).]

T.I. argues that, to resolve this potential conflict, "feasible" must be defined by an alternative definition, "capable of being managed, utilized or dealt with successfully; suitable" or "reasonable." *See Webster's, supra*, at 926. T.I.'s argument is flawed as it relies upon the erroneous premise that *N.J.S.A.* 3B:12A–6(d)(4) requires a finding that *adoption* is in the child's best interest. As noted above, *N.J.S.A.* 3B:12A–6(d)(4) requires a finding that "awarding *kinship legal guardianship* is in the child's best interests." (Emphasis added). In any case, the definition of "feasible" urged by T.I. is inconsistent with the expressed legislative intent.

In *N.J.S.A.* 3B:12A–1, the Legislature declared it was "in the public interest to create a new type of legal guardianship that addresses the needs of children and caregivers in long-term kinship relationships." As the Legislature's findings make clear, the meaning of "neither feasible nor likely" forms a core basis for the creation of KLG:

> a. There is an increase in the number of children who cannot reside with their parents due to the parents' incapacity or inability to perform the regular and expected functions of care and support of the child;
>
> b. An increasing number of relatives, including grandparents, find themselves providing care on a long-term basis to these children without court approved legal guardianship status *because the caregivers either are unable or unwilling to seek termination of the legal relationships between the birth parent and the child,* particularly when it is the caregiver's own child or sibling who is the parent. *In these cases, adoption of the child is neither feasible nor likely,* and it is imperative that the State create an alternative, permanent legal arrangement for children and their caregivers.
>
> [*N.J.S.A.* 3B:12A–1(b) (emphasis added).]

Based upon these findings, the Legislature found it necessary "to add another alternative, permanent placement option, beyond custody, without rising to the level of termination of parental rights, for caregivers in relationships *where adoption is neither feasible nor likely* [.]" *N.J.S.A.* 3B:12A–1(c) (emphasis added).

These findings clarify that it is the inability or unwillingness of a caregiver to adopt that renders adoption "neither feasible nor likely." *See also N.J. Div. of Youth & Family Servs. v. L.L.,* 201 *N.J.* 210, 222, 989 *A.*2d 829 (2010) (observing that, in adopting the KLG Act, Legislature agreed that "[w]hen a child is placed with a relative, termination is both unnecessary and unwise *unless the relative wishes to adopt the child* or is unwilling to provide long-term care" (emphasis added) (internal citations and quotation marks omitted)); *N.J. Div. of Youth & Family Servs. v. P.P.,* 180 *N.J.* 494, 508, 852 *A.*2d 1093 (2004) ("When adoption is neither feasible nor likely, particularly in those cases where the caregiver's own child or sibling is the parent, an alternative, permanent legal arrangement is available for children and their caregivers."); *N.J. Div. of Youth & Family Servs. v. S.F.,* 392 *N.J.Super.* 201, 213, 920 *A.*2d 652 (App.Div.2007) (finding requirement of third

prong that "adoption is neither feasible nor likely" was satisfied when paternal grandparents were not willing to adopt children), *certif. denied*, 192 *N.J.* 293, 927 *A.*2d 1292 (2007).

The evidence that M.M. wanted to adopt S.L.M. was compelling. At the time he testified, S.L.M. was four years old and had been in his custody since she was nine months old. He stated unequivocally that he and his wife wanted to adopt S.L.M. and that there was no event or circumstance he could envision that would change his mind. DYFS had explained the difference between adoption and KLG to him and, as he explained, in a KLG, T.I. "would maintain her parental rights, but we would have physical and legal custody of the child." He had given the matter careful consideration and did not want a KLG. Although he was willing to allow T.I. to maintain contact with S.L.M. after adoption, he did not think that a KLG was in S.L.M.'s best interest and would be unable to sign a certification that it was. He stated, S.L.M. "needs to be part of a family, and she's grown into our family. . . . She's part of our family, and that's where she's been for four years of her life, and that's what she knows. And she needs that stable environment." M.M. was aware that T.I. had attempted rehabilitation in the past and had concerns that she might relapse into drug use. He believed that a KLG would threaten the stability S.L.M. enjoys in his family:

> [T.I.] would be interfering in her daily life, and once she . . . thinks she's got her life back together, she wants to probably try to drag it back into Court, to try to gain custody of [S.L.M.]. And we—she needs—we have her where she's stable, she's in a good home, she's loved, and she's cared for, and she deserves that opportunity in life.

Despite this unequivocal testimony, T.I. contends that adoption was not feasible. She argues that it is questionable whether M.M. made an informed decision regarding KLG and that he could not articulate a cogent or sufficient basis for rejecting KLG. T.I. also argues that, by allowing M.M. to effectively exercise veto power over KLG, the court abdicated its obligation to decide whether KLG was the appropriate permanency plan.

We disagree. There is no statutory authority that establishes any burden a caregiver who wants to adopt must meet in rejecting KLG. Moreover, M.M.'s testimony shows that he clearly understood the alternatives and that his reasons for rejecting a KLG were consistent with the Legislature's stated goals. We are satisfied the trial court did not abdicate its obligation in accepting M.M.'s testimony, which clearly defeated any finding that adoption was not feasible or likely. Because "a kinship legal guardian may only be appointed when 'adoption of the child is neither feasible nor likely[,]'" *P.P., supra,* 180 *N.J.* at 509, 852 *A.*2d 1093 (quoting *N.J.S.A.* 30:4C–15.1(3)(b)), one of the findings required for the court to create a KLG was unproven. There was, then, no need to determine whether KLG was in the best interest of S.L.M. *See id.* at 514, 852 *A.*2d 1093.

We are satisfied the record supports the conclusion that the criteria for awarding a KLG were not met here. However, even if a KLG were considered potentially available, that would not provide a basis for defeating the termination of parental rights.

> The plain language of the [KLG] Act, as well as its legislative history, establish kinship legal guardianship as a more permanent option than foster care when adoption "is neither feasible nor likely" and "kinship legal guardianship is in the child's best interest." Conversely, when the permanency provided by adoption is available, kinship legal guardianship cannot be used as a defense to termination of parental rights...
>
> [*P.P., supra,* 180 *N.J.* at 512–13, 852 *A.*2d 1093 (internal citations omitted).]

## IV

As for the fourth prong of the analysis, T.I. does not challenge the sufficiency of the evidence that she lacks the tools to ameliorate the harm caused by a severing of the relationship between S.L.M. and her paternal grandparents or that the grandparents do have the ability to meet S.L.M.'s needs in facing the loss of her relationship with her mother. Rather, she argues that these factors are irrelevant because, in a KLG, S.L.M. would continue to reside with her paternal grandparents. This argument lacks merit because, for the reasons previously stated, the grounds for ordering a KLG do not exist here. *See id.* at 514, 852 *A.*2d 1093.

■  T.I. further contends that terminating her rights will do more harm than good because she and S.L.M. are bonded and because she has had some success in her attempts to address obstacles to her ability to care for S.L.M. She argues that the trial court did not give sufficient weight to the long-term harm S.L.M. will suffer from the termination of T.I.'s parental rights.

These arguments lack merit. A review of the expert testimony at trial shows that the trial court's conclusions were supported by adequate evidence.

Psychological evaluations of T.I. and bonding evaluations of S.L.M. with her paternal grandparents and T.I. were conducted by Alan S. Gordon, Ed.D. (at DYFS's request), Jeffrey Allen, Ph.D. (at the request of T.I.'s counsel) and Maureen Santina, Ph.D. (at the request of S.L.M.'s law guardian). All three experts diagnosed T.I. with post-traumatic stress disorder. In addition, Dr. Gordon and Dr. Allen diagnosed T.I. with bipolar 1 disorder. All three experts also testified that T.I. is at an elevated risk of child abuse on the Child Abuse Potential Inventory. Dr. Allen found that on a parenting stress index T.I. had high levels of isolation, health problems and depression. Dr. Gordon opined at trial that T.I. was not a fit parent for S.L.M. Dr. Allen also testified that he did not believe T.I. was a suitable parent for S.L.M.

All three experts recognized the existence of a bond between S.L.M. and T.I. However, each of them also recognized that S.L.M.'s bond with her paternal grandparents was stronger. Dr. Allen, who was retained by T.I.'s counsel, testified that, although S.L.M. has a positive bond with T.I., it is much more insecure and ambivalent than her very strong, positive bond to the paternal grandparents. Dr. Santina opined that S.L.M.'s attachment to T.I. was much more tentative than her attachment to the paternal grandparents whom she identifies as her primary caregivers. All three experts also agreed that the paternal grandparents were capable of helping S.L.M. cope with any emotional harm she might suffer at the loss of her relationship with T.I.

At trial, Dr. Allen was the only psychologist who recommended a KLG. His recommendation included monitoring and a re-evaluation after twelve to eighteen months, a period of additional time for T.I. to comply with services while maintaining a relationship with S.L.M. Although Dr. Gordon stated he would like to see T.I. continue to be involved in S.L.M.'s life and had previously considered KLG preferable, he recommended adoption at the time of trial. He cited T.I.'s reversion to past bad behaviors, S.L.M.'s increasing need for permanency, a lack of cooperation between the paternal grandparents and T.I., and a belief that the paternal grandparents are sufficiently equipped to help S.L.M. cope with the loss of her relationship with T.I. Dr. Santina opined that S.L.M.'s relationship with T.I. was not positive and, therefore, was not in S.L.M.'s best interest. She believed a permanent placement with the paternal grandparents was in S.L.M.'s best interest because T.I. could not become a viable caregiver in the foreseeable future. Dr. Santina recommended adoption by the paternal grandparents and not a KLG arrangement because KLG would permit T.I. visitation with S.L.M., which she did not believe was in S.L.M.'s best interest. In fact, she recommended against unsupervised visitation. Dr. Santina also expressed concern that a KLG would confuse S.L.M. about the permanency of her relationship with her paternal grandparents.

The testimony of the experts thus provided ample support for the trial court's conclusion that the termination of T.I.'s parental rights will not do more harm than good.

Affirmed.