# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5093-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

P.G.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF G.B.,

      a Minor.

_____

Submitted May 30, 2019 – Decided June 19, 2019

Before Judges Whipple and Firko.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FG-19-0028-15.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender,

of counsel; Bruce Pozu Lee, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason Wade Rockwell, Assistant Attorney General, of counsel; Victoria Almeida Galinski, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Danielle Ruiz, Designated Counsel, on the brief).

PER CURIAM

Defendant P.G.,[1] the biological father of G.B., born in July 2008, appeals from the June 19, 2018 judgment of guardianship, which terminated his parental rights to the child. P.G. contends the trial judge erred in finding P.G. was properly served with the complaint, that the judge erred in finding the Division of Child Protection and Permanency (Division) proved prongs three and four of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence, and the judge erred in granting the Division's application for a default judgment pursuant to Rules 1:2-4(a) and 4:43-1. We reject these contentions and affirm.

We will not recite in detail the history of the Division's involvement with the family. Instead, we incorporate by reference the factual findings set forth in

---

[1] Pursuant to Rule 1:38-3(d), we use initials to protect the confidentiality of the participants in these proceedings.

Judge Michael C. Gaus's comprehensive written opinion dated June 19, 2018. We add the following comments.

I.

After referrals alleging neglect of G.B. by K.B., her biological mother, the Division conducted investigations prior to 2014 which initially resulted in unsubstantiated findings. Thereafter, on February 19, 2014, a representative from G.B.'s school reported that she was coming to school "in dirty and ill-fitting clothing[,]" smelled of urine, and her hair needed shampooing and brushing. K.B. refused to discuss hygiene concerns with the school nurse. The school also expressed concerns about G.B.'s tardiness, absenteeism, failure to complete homework, and difficulty in contacting her parents. Following an Order to Investigate entered on March 11, 2014, K.B. underwent a random urine screen which revealed she and her live-in paramour, N.H., "were either on strong painkillers such as were given to cancer patients or were on heroin."

Because of K.G.'s drug use and concerns for G.B.'s welfare, a Dodd removal[2] took place on April 10, 2014. P.G. was not a viable option for placement at that time because "[h]e was residing in some type of shelter. There

_____

[2] A Dodd removal is an emergency removal of a child from a parent's custody without a court order, as authorized by the Dodd Act, N.J.S.A. 9:6-8.29.

were ongoing criminal history concerns, substance abuse concerns, [and] mental health concerns." He did not appear at the hearing, despite the Division's attempts to notify him, and his visitation with G.B. was thereby suspended. The child was placed with her paternal great aunt, S.C., and great uncle, M.C.

In November 2014, P.G. reported he was engaged in mental health services at Bergen Regional Medical Center, where he was being drug screened five days per week. Division notes indicate he "was not forthcoming if he was in a dual diagnosis program." P.G. reported that he was receiving services through the Mentally Ill Chemical Abuser program for anxiety and depression, and he was prescribed Celexa and Klonopin. He refused to sign release forms to allow the Division to access his records. P.G.'s visitation remained suspended due to his failure to appear in court. In January 2015, the Division documented its attempts to coordinate P.G.'s services with S.C., since he was not communicating with the Division directly. Despite efforts to accommodate P.G.'s transportation issues, he continued to miss meetings and evaluations.

In March 2015, Family Intervention Services recommended against the implementation of therapeutic supervised visitation between P.G. and G.B. S.C. and M.C. expressed concern about her placement, and wanted her removed from their home. Due to this potential transition, the clinician opined that P.G. should

comply with recommendation services before initiating therapeutic supervised visitation with G.B. On March 4, 2015, P.G. failed to appear for the permanency hearing, and the judge approved the Division's plan to proceed with termination of P.G.'s parental rights.

On April 18, 2015, the Division filed a complaint, seeking to terminate P.G.'s parental rights. G.B. was removed from S.C. and M.C.'s home on October 9, 2015, due to an allegation that she stole a necklace from S.C., and G.B. was placed into pre-adoptive placement with M.B. and M.K. P.G. completed an identified surrender to M.B. and M.K. on December 11, 2015, with the understanding that if the family did not adopt G.B., his surrender would be voided. M.B. described G.B. "is like a [seven] year old who is manipulative and conniving like an [eighteen] year old girl. [They] have been doing this for [eighteen] years and she is at the top of manipulation." Thereafter, the pre-adoptive parents requested G.B. be removed from their home due to her behavioral issues, and G.B. was placed in a non-relative, resource home, the K. Family, on March 23, 2017. G.B. was diagnosed with Attention Deficit Hyperactivity Disorder.

A-5093-17T2

K.B.'s parental rights were terminated on April 25, 2016, after a separate trial. K.B. appealed this decision, which we affirmed.[3] The K. Family ultimately decided they would not pursue adoption, and P.G.'s parental rights were reinstated as per the terms of the court order. The Division filed an abridged verified complaint on April 28, 2017, and the guardianship trial against P.G. proceeded. In April 2017, S.C. expressed interest in visiting G.B. again and being considered as a placement option for G.B. Based upon G.B.'s previous placement with S.C. and M.C., caseworker M.D. confirmed they were seriously considering adoption. G.B. was placed with S.C. and M.C. again on August 9, 2017, where G.B. currently remains. The Division case notes indicated although S.C. and M.C. "continue[d] to state they [were] committed to [G.B.] long[-]term, concerns continue to arise where they mention to worker that someone else would be better suited for her."

P.G.'s trial was held on March 6, March 26, March 27, and April 17, 2018, and he failed to appear on any of these dates. The law guardian and P.G.'s counsel submitted written summations on May 7, 2018, and oral summations were conducted on May 10, 2018, including by P.G.'s counsel. The Division

---

[3] N.J. Div. of Child Prot. and Permanency v. K.B., No. A-3767-15 (App. Div. Aug. 31, 2017).

proffered the caseworker, M.D., as a fact witness, and Dr. Mark Singer as its expert witness. G.B. testified as the law guardian's witness without objection, [4] and no witnesses were called on P.G.'s behalf. G.B. testified she sometimes refers to S.C. and M.C. as mom and dad, they go to the movies, play charades and board games, and go "ghost hunting" together. G.B. testified she is "very excited and happy to know that [she's] going to have a forever family and [she's] really excited to spend the rest of [her] life with [S.C. and M.C.]."

G.B. also testified that her parents did not act like "real parents" because she "would not get a shower. [She] barely had any food there. They just gave [her] bread and peanut butter. They wouldn't really take [her] to school. And they wouldn't . . . help [her] with anything." She also testified her parents never lived together, and that she would visit her father occasionally, sometimes when K.B. was "partying." G.B. explained that P.G. was not part of her daily life, but she would visit him sometimes when K.B. "wanted to go party with her friends," which was usually every other weekend. G.B. testified she never saw her father doing drugs, but she knew that he did because she saw bags with writing at his house that resembled the bags she saw at K.B.'s house. She testified the drugs

---

[4] G.B.'s testimony was elicited in chambers and transmitted into the courtroom simultaneously on a monitor.

at her father's house were white, "crushed up pills[,]" with names written on them, and they were left on the tables and dressers.

The judge found M.D. was unprepared for trial because P.G. relocated to Florida, the caseworker was uncertain as to when the Division was notified he moved, and "she had put minimal efforts to review the Division record in preparing her testimony." M.D. recalled a telephone conversation she had with P.G. in June 2017 notifying him that the adoption with M.K. and M.B. fell through. P.G. expressed an interest in reunification, and M.D. offered to assist him in finding appropriate housing. P.G. provided the Division with an address in Paterson, which he stated served as his mailing and residential address. The Division sent human resource police and made other efforts to locate P.G., but no in-person contact was ever made.

P.G. also advised he resided in Clifton, Budd Lake, Butler, and Little Falls at various times, and the Well of Hope Center in Paterson. The Division sent regular and certified mail, return receipt requested, to all of the addresses provided by P.G., and made in-person attempts to communicate with him, but he could not be located. All of the letters attempting to advise P.G. of the date and location of the hearing, and offering him transportation, were returned as unclaimed.

On August 2, 2017, the Division sent via certified and regular mail, a notice to P.G. at Well of Hope Center notifying him of its intention to proceed with a default hearing against him and to terminate his parental rights on August 11, 2017. On August 3, 2017, M.D. sent defendant a text message which read: "[P.G.] it's [M.D.] from [the Division]. I'm coming to Paterson this morning. Where can [I] meet you to give you some court paperwork and talk about next week?" P.G. responded that he was in Paterson at the time, but when M.D. arrived, he could not be located despite follow-up text messages, phone calls, and voice messages. Despite receiving no response, a Division caseworker waited for P.G. across the street from the Well of Hope Center, but he never showed. Consequently, P.G.'s visitation was suspended again and remained suspended through October 2017.

M.D. also testified that at some point, P.G. blocked incoming calls on his phone, preventing the Division from contacting him via telephone. She also text messaged P.G. each time before she attempted to call him, and reached out through the Division Facebook liaison, but she could never get confirmation that her messages were received or read. The Division confirmed that defendant was not incarcerated before the trial commenced. M.D. testified that P.G. never requested visitation with G.B., and he did not attend any Division meetings.

9

At the time of trial, the Division suspected P.G. was living in a shelter, but could not verify same. M.D. testified about P.G.'s criminal and substance abuse history, and she expressed concerns about his mental health. She confirmed that P.G. "never accepted or cooperated with Division services, including when he was given a referral and asked to provide a urine screen[.]"

Singer conducted bonding evaluations of P.G., M.K., and M.B., as well as with S.C. and M.C. The judge found Singer "highly knowledgeable in his psychological field of expertise and experienced in testifying in court proceedings." Singer has been a licensed psychologist in New Jersey since 1999, and the judge found him "qualified to testify as an expert, specifically regarding attachment and bonding, as reflected in the multiple years of his experience during which he has developed an expertise in attachment and bonding[.]"

P.G.'s counsel argued that Singer was not qualified as an expert on attachment and bonding issues based on criticism of his conclusions in one of our unpublished dissenting opinions, and because in an earlier bonding evaluation with M.K. and M.B., Singer concluded the couple had become G.B.'s "psychological parents" after living with them for only thirty days. The judge disagreed and permitted Singer to testify as an expert.

A-5093-17T2

Singer testified that P.G. failed to appear for a bonding evaluation on January 15, 2018. Singer conducted a bonding evaluation between G.B., S.C., and M.C. on January 18, 2018, and clinical interviews. Prior bonding evaluations of M.K., M.B., and K.B. were conducted on October 13, 2015 and December 17, 2015, and were relevant because they showed G.B. has the ability to psychologically connect with persons representing a parental figure in her life. Singer testified that attachment and bonding are used interchangeably, and deals with "a relationship that evolves over time, [and] begins at birth." He explained:

> [I]t's the type of relationship which a child looks to for love, for nurturance, for security, and the idea behind it . . . is that that relationship becomes the model for future relationships. It becomes the schemata which a child uses to help navigate the challenges associated with childhood and . . . associated with adolescents and adults. It's the basic sense of security.

Singer addressed the initial failed placement with S.C. and M.C., and noted "it appears that [G.B.] had stolen something from [S.C. and M.C.] and there was information offered that the biological mom . . . may have been influencing [G.B.] at a point in time." Singer testified G.B.'s behavior had improved over time, and it "speaks to the idea that as consistency for this child increases, her behavior and emotional state is likely to become more stable over

11

time." S.C. and M.C. did not express any concerns regarding G.B.'s current behavior. Singer opined G.B. "has a positive perception" of her relationship with S.C. and M.C., has "really integrated into the family system[,]" and has come to see them "as being central parental figures in her life." Noting that he did not have the opportunity to meet with P.G., due to his failure to attend his evaluation, Singer testified:

> [I]t appears that the biological father has absented himself from this child's life. The child has a history of inconsistency, has experienced significant abandonment, has a desire to connect, has the ability to connect, and has come to see [S.C. and M.C.] as being central parental figures, and . . . unfortunately [there is] no other data to suggest there's any other alternative available to [G.B.] to achieve permanency.

The judge granted the Division's application to terminate defendant's parental rights, and also entered a default judgment against him, pursuant to Rules 1:2-4(a) and 4:43-2(b).

## II.

An appellate court is limited in its review of parental termination cases. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278 (2007). A trial court's fact finding should be generally undisturbed "when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998). The appellate court gives particular deference to a trial judge's fact

finding in a family matter because the trial court's expertise and its "opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting M.M., 189 N.J. at 293).

A trial judge's fact finding should only be disturbed if his or her findings "are so wholly unsupportable as to result in a denial of justice." In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). This court should not reverse the family court's decision "when there is substantial credible evidence in the record to support the court's findings." E.P., 196 N.J. at 104. The appellate scope of review is expanded when the "trial judge is clearly mistaken and his [or her] decision so plainly unwarranted that the interests of justice demand intervention and correction." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 112 (App. Div. 2004) (quoting Formosa v. Equitable Life Assurance Soc'y, 166 N.J. Super. 8, 20 (App. Div. 1979)).

P.G. first contends the Division did not comply with service of process requirements pursuant to N.J.S.A. 30:4C-17(b), and that the judge erred in finding the Division was not required to serve P.G. with the abridged complaint.

A-5093-17T2

We disagree. The judge aptly found that the Division met its burden in attempting to locate P.G. and serve him with the abridged complaint even though there was no requirement to do so. P.G. also claims that it is unclear whether service of the first complaint was proper because the Division's records do not indicate he was served.

Division case notes indicate that on April 16, 2014, two caseworkers met with P.G. "to serve him with the court paperwork from the removal of his daughter," and P.G. was "upset that he was not given much notice to go to court." Moreover, P.G. appeared at the 2014 hearing, leading the judge to appropriately find P.G. was duly served. Further, P.G. telephoned the Division on May 23, 2014 "to report that he had been served the court order and all supporting documentation." The judge found P.G. appeared with counsel when he completed his identified surrender, he was notified that his parental rights were reinstated when the proposed adoption fell through, and P.G.'s counsel was reinstated upon the filing of the abridged verified complaint.

While "[i]t is well[-]established as a matter of due process principle that procedural requirements are more demanding in parental termination cases than in ordinary civil actions," due process "is a flexible concept and calls for such

14

procedural protections as the particular situation demands." N.J. Div. of Youth & Family Servs. v. M.Y.J.P., 360 N.J. Super. 426, 464, 467 (App. Div. 2003).

> An action for termination of parental rights is a civil action. The requirements of due process do not confer a constitutional right of confrontation or mandate a parent's presence at the trial. The question to be answered is not whether particular procedures were used, but rather whether those procedures which were employed were appropriate and adequate to protect the interests at stake.
>
> Procedural due process standards require the opportunity for meaningful participation by the person at risk of limitation in any trial in which important rights or interests are to be adjudicated.
>
> [Id. at 467-68 (citations omitted).]

In determining whether a parent's due process requirements have been met, our courts have applied the three-prong test set forth in Mathews v. Eldridge, 424 U.S. 319, 335 (1976). This test requires the court to consider: 1) "the private interest that will be affected by the official action;" 2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" 3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement

would entail." Ibid. In balancing the third factor, we relied on a New York case, which held:

> [T]he children's right to a prompt determination of their status is just as important as the interest of the father, and that an indefinite delay of the children's right is a more egregious deprivation than the father's loss of his right to be present at the hearing. This right of the father is only one part of his due process rights in these proceedings, and its loss will not necessarily deprive him of a fair hearing. The risk that his absence will lead to an erroneous decision can be reduced or eliminated by permitting him to give testimony by deposition, if possible, and by his representation at trial by his attorney. The loss by the children of their day in court will, on the other hand, deprive them completely of their right to a judicial determination of their status.
>
> [M.Y.J.P., 360 N.J. Super. at 470-71 (quoting Matter of Raymond Dean L., 490 N.Y.S.2d 75, 78 (App. Div. 1985)).]

The law guardian and the Division argue N.J.S.A. 30:4C-17(b), which requires the Division to serve a parent with notice of a guardianship proceeding, was satisfied. We agree. If personal service cannot be achieved because the parent's whereabouts are unknown, "the court shall determine that an adequate effort has been made" if the Division has

> (1) Sent the notice by regular mail and by certified mail return receipt request, to the last known address of the parent;

(2) Made a discreet inquiry among any known relatives, friends, and current or former employees of the parent;

(3) Unless otherwise restricted by law, made direct inquiries, using the party's name and last known or suspected address, to the local post office, the New Jersey Motor Vehicle Commission in, but not of, the Department of Transportation, the county welfare agency, the municipal police department, the Division of State Police in the Department of Law and Public Safety, the county probation office, the Department of Corrections, and any other social service or law enforcement agency known to have had contact with the parent, or the equivalent agencies in other states, territories, or countries.

[N.J.S.A. 30:4C-17(b).]

The statute requires the notice to "inform the parent of the purpose of the action and of the right to file written objections to the guardianship proceedings within "[twenty] days after notice is given in the case of a resident[.]" Ibid.

P.G. claims the judge infringed on P.G.'s constitutional right to due process under the Fourteenth Amendment, and that proper notice of the first complaint was not sufficient to establish notice of the abridged complaint, noting the failure of adoption as an intervening event, and that none of the letters sent to him informed him of his right to file written objections. He contends "[t]he letters expressed ambiguity as to whether litigation had commenced, when in fact [the Division] had filed its complaint." The subject letter dated August

2, 2017 states: "The Division intends to move forward in an effort to terminate parental rights at this time. Failure to attend the court hearing . . . may result in default being entered against you, with a [t]ermination of [p]arental [r]ights trial[.]"

The judge found that P.G. appeared in court and completed an identified surrender of his parental rights, indicating that he received the initial verified complaint. The Division submitted three affidavits of inquiry, dated July 13, 2017, October 10, 2017, and December 5, 2017, detailing its diligent efforts to locate and serve P.G. with the abridged verified complaint, including sending certified and regular mail to his various addresses, and efforts to call, text, Facebook message, and perform on-site visits. A fourth affidavit of diligent inquiry, dated February 14, 2018, redacted in part, revealed the Division attempted to secure an address for P.G. by making inquiries with the New Jersey State Police, United States Postal Service, New Jersey Motor Vehicle Commission, New Jersey Parent Locator Services, New Jersey Department of Corrections, New Jersey Employer Accounts, and New Jersey Bureau of Parole, to no avail. S.C. also provided contact information for P.G. He also argues affidavits of inquiry do not constitute sufficient service for a guardianship proceeding. We are convinced that the judge had substantial, credible evidence

to conclude the Division satisfied the "adequate effort" standard pursuant to N.J.S.A. 4C-17(b).

III.

P.G. contends the judge erred in finding the Division proved prongs three and four of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. Our Supreme Court has established the standard of review in parental termination cases:

> Our task as an appellate court is to determine whether the decision of the family court in terminating parental rights is supported by "'substantial and credible evidence' on the record." We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family. . . . We will not overturn a family court's factfindings unless they are so "wide of the mark" that our intervention is necessary to correct an injustice. It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights.
>
> [N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012) (first quoting M.M., 189 N.J. at 279; then quoting E.P., 196 N.J. at 104).]

Applying this standard, we discern no error in the judge's findings.

P.G. argues the judge erred in finding the Division proved prong three by clear and convincing evidence because the Division did not explore alternatives to termination and failed to engage P.G. in planning for G.B's permanency. We disagree.

"The third prong requires an evaluation of whether [the Division] 'made reasonable efforts to provide services to help the parent' remedy the circumstances that led to removal of the children from the home." F.M., 211 N.J. at 452 (quoting N.J.S.A. 30:4C-15.1(a)(3)). The emphasis on the third prong

> is on the steps taken by [the Division] toward the goal of reunification. "The diligence of [the Division's] efforts on behalf of a parent is not measured by" whether those efforts were successful. "'Reasonable efforts' may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." Experience tells us that even [the Division's] best efforts may not be sufficient to salvage a parental relationship.
>
> [Ibid. (citation omitted) (first quoting In re Guardianship of DMH, 161 N.J. 365, 393 (1999); then quoting M.M., 189 N.J. at 281).]

As part of the inquiry, "the court must consider the alternatives to termination of parental rights and whether the Division acted reasonably." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 434-35 (App. Div. 2001).

"The reasonableness of the Division's efforts depends on the facts in each case." Id. at 435. "Services that may address one family's needs will not be helpful to another." DMH, 161 N.J. at 390. Therefore, "[w]hether particular services are necessary in order to comply with the diligent efforts requirement must . . . be decided with reference to the circumstances of the individual case before the court, including the parent's active participation in the reunification effort." Ibid.

Nevertheless, "[t]he diligence of [the Division's] efforts on behalf of a parent is not measured by their success. Thus, the parent's failure to become a caretaker for his [or her] children is not determinative of the sufficiency of [the Division's] efforts at family reunification." Id. at 393. Rather, the Division's "efforts must be assessed against the standard of adequacy in light of all the circumstances of a given case." Ibid. Moreover, even if the services offered were deficient, reversal of a termination order is not necessarily warranted. N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012). The best interests of the children controls. Ibid.

A-5093-17T2

P.G. does not dispute the Division made reasonable efforts here, but instead relies on S.C. and M.C.'s equivocal position on whether they would adopt G.B. to support his contention that the Division did not properly explore alternatives to termination. At one point, S.C. and M.C. were willing provide Kinship Legal Guardianship (KLG) for G.B. KLG is an alternative to termination of parental rights, but is not a defense to termination. N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 513 (2004). P.G. argues adoption should only be considered when a caregiver "unequivocally asserts a desire to adopt[.]" N.J. Div. of Youth & Family Servs. v. T.I., 423 N.J. Super. 127, 130 (App. Div. 2011).

The Kinship Guardianship Act, N.J.S.A. 3B:12A-1(b), was created to provide children with safe and stable homes where "caregivers either are unable or unwilling to seek termination of the legal relationships between the birth parent and the child . . . . In these cases, adoption of the child is neither feasible nor likely[.]" The statute allows for KLG as an alternative to termination, and "is intended to be permanent and self-sustaining, as evidenced by the transfer to the caregiver of certain parental rights, but retains the birth parents' right to consent to adoption, the obligation to pay child support, and the parents' right to have some ongoing contact with the child[.]" Ibid. P.G. claims the purpose of

the act, along with M.C. and S.C.'s unwillingness to adopt G.B., required the Division to consider them for KLG instead of adoption.

KLG, however, should only be utilized when adoption is neither feasible nor likely. P.P., 180 N.J. at 509. Our Supreme Court held "[t]he plain language of the [Kinship Guardianship] Act, as well as its legislative history, establish [KLG] as a more permanent option than foster care, when adoption" cannot be achieved. Id. at 512. There, our Supreme Court held that because grandparent adoption was feasible for the children, KLG was not available. Ibid. The Supreme Court further held "when the permanency provided by adoption is available, [KLG] cannot be used as a defense to termination of parental rights under N.J.S.A. 30:4C-15.1[(a)](3)." Id. at 513. KLG "is not intended as an equally available alternative to termination that must be considered in order to satisfy the third element of N.J.S.A. 30:4C-15.1[.]" N.J. Div. of Youth & Family Servs. v. S.V., 362 N.J. Super. 76, 88 (App. Div. 2003).

Consistent with the judge's findings and conclusions, and contrary to P.G.'s arguments on appeal, the record reflects the Division sought alternatives to adoption. Although S.C and M.C. requested G.B. be removed from their home, Singer testified that her behavior improved because she had limited contact with her biological parents. S.C. and M.C. "always expressed an

ongoing interest in her life and wanted to be a part of her life[,]" and later expressed a strong interest in adopting G.B. The Division is not at fault for P.G.'s failure to see G.B. for the four years after she was removed from K.B.'s care. The judge concluded the Division "persistently and creatively" took steps to locate P.G. through formal search methods, he was aware of the formal search methods, he was aware of the failed placement with S.C. and M.C., and he expressed an interest in planning for G.B. in June 2017.

The court's focus must be on determining the best interests of the child. A.G., 344 N.J. Super. at 442. The judge did so here. The record supports his factual findings and conclusions that the Division established prong three by clear and convincing evidence.

## IV.

Prong four of N.J.S.A. 30:4C-15.1(a) requires the Division to show by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good." The fourth prong serves as "a 'fail-safe' inquiry guarding against an inappropriate or premature termination of parental rights." F.M., 211 N.J. at 453. "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." E.P., 196 N.J.

at 108.  The court must determine "whether . . . the child will suffer a greater harm from the termination of ties with [his or] her natural parents than from the permanent disruption of [his or] her relationship with [his or] her foster parents." In re Guardianship of K.H.O., 161 N.J. 337, 355 (1999).

Because harm to the child stemming from termination of parental rights is inevitable, "the fourth prong of the best interests standard cannot require a showing that no harm will befall the child as a result of the severing of biological ties." Ibid.  Rather, the court's inquiry is one of comparative harm, for which the court must consider expert evaluations of the strength of the child's relationship to the biological parents and the foster parents.  Ibid.  Thus, "[t]o satisfy the fourth prong, the [Division] should offer testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents."  F.M., 211 N.J. at 453 (quoting M.M., 189 N.J. at 281).  "Under this prong, an important consideration is '[a] child's need for permanency.'  Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his most deeply formed attachments will not be shattered."  Ibid. (alteration in original) (quoting M.M., 189 N.J. at 281).

A-5093-17T2

Here, the judge found:

> Throughout the course of this litigation, [P.G.] has done nothing to plan meaningfully for [G.B.] nor has he done anything to move toward reunification with the child. The record reflects he had the ability to contact the Division and/or [S.C.] in order to have contact with [G.B.] but chose not to be available for visitation with [G.B.] for the four years following her removal from [K.B.]. Even before this litigation, [P.G.] was a "back-up" parental figure for [G.B.] when [K.B.] was unavailable to care for the child.

P.G. contends Singer's testimony was flawed because he was unaware of instances where G.B. was struck in the shower by M.K., who also allegedly pulled her hair out of impatience. Other information elicited from Singer on cross-examination, such as G.B.'s request to be removed from S.C. and M.C.'s care six months before trial and their comment that someone else may be "better suited" to care for G.B., warrants reversal according to P.G. His contention lacks merit. Singer pointed out that there was no relationship between P.G. and G.B., and she never viewed P.G. as a caretaker. Moreover, G.B. testified she wished to remain in S.C. and M.C.'s care and to be adopted by them. In addition, Singer addressed concerns regarding S.C. and M.C.'s willingness to adopt and he determined that they are committed to permanently adding G.B. to their family. The judge did not err in relying on Singer's uncontroverted testimony.

26

In relying upon Singer's testimony, the judge found P.G.'s absenteeism from G.B.'s life led to severance of the father/daughter relationship. The judge relied on Singer's opinion that if G.B. were to be removed from S.C and M.C.'s care, "there would likely be significant negative reaction to the loss of that relationship which would likely build upon her history of previous losses."

Singer further stated, "accessibility and responsiveness is a key necessity in developing a healthy bond and attachment between parent and child, and that healthy bond is absent here because the biological father has been absent from [G.B.'s] life for the last four years." The judge also relied upon Singer's testimony that G.B. "perceives her relationship with [S.C. and M.C.] as representing a position of consistency and stability" and that they "support the child's interest in various activities and have integrated her into the family system." Singer also testified G.B. "looks to the love, nurturance and stability being offered by adult figures, and this becomes a model for future relationships and represents a basic sense of security in a child's life." G.B. fully bonded with S.C. and M.C., and they represent "the central parental figures in her life." Singer testified that G.B. will be harmed if permanency is not achieved or further delayed, and he noted that because the paternal aunt and uncle are related to

G.B., they would be in a better position to answer any questions she might have about her origins, adding a mitigating element to their relationship.

The judge rightfully concluded that termination of P.G.'s parental rights would not do more harm than good, as termination would provide G.B. with the permanency and stability she requires because she will be made legally free for adoption by her resource parents.

The record supports the judge's factual findings and conclusion that the Division established prong four by clear and convincing evidence. The record evidences no realistic possibility that P.G. will ever be able to safely and appropriately parent G.B., and certainly not in time to meet her permanency needs. Moreover, Singer testified, without contradiction, that G.B. already "severed" her relationship with P.G., leading the judge to conclude "to prolong resolution of her status by indefinitely extending resource care placement[,]" termination of P.G.'s parental rights would not do G.B. more harm than good. See N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 592 (App. Div. 1996). Singer's bonding evaluation concluded that G.B. views S.C. and M.C. as her "psychological parents."

V.

Lastly, P.G. argues that the judge improperly entered default pursuant to Rules 1:2-4(a) and 4:43-1. Rule 1:2-4(a) provides:

> [I]f without just excuse or because of failure to give reasonable attention to the matter, no appearance is made on behalf of a party on the call of a calendar, on the return of a motion, at a pretrial conference, settlement conference, or any other proceeding scheduled by the court, or on the day of trial, or if an application is made for an adjournment, the court may order . . . (c) the dismissal of the complaint, cross-claim, counterclaim or motion, or the striking of the answer and the entry of judgment by default, or the granting of the motion; or (d) such other action as it deems appropriate.

Further, Rule 4:43-1 allows default to be entered against a party if he or she "has failed to plead or otherwise defend as provided by these rules or court order[.]" Default may not be entered solely because a parent was not present at trial if he or she was present at all prior court hearings and cannot be based on the defendant's failure to appear in court alone. N.J. Div. of Youth & Family Servs. v. P.W.R., 410 N.J. Super. 501, 506 (App. Div. 2009), rev'd on other grounds, 205 N.J. 17 (2011). The trial court must examine the reasons for a defendant's failure to appear and consider whether defendant's presence is of sufficient importance as to warrant entering a default. Id. at 508-09.

P.G. argues that his counsel was present throughout the litigation, making default against him improper and constituting an infringement of his due process rights. The Division and the law guardian direct our attention to P.W.R. to distinguish from the case at hand. In P.W.R., a default judgment was entered against the defendant mother after she failed to appear at a two-day fact finding hearing. Id. at 504-05. We found the trial court's entry of default constituted error because defendant appeared at all of the previous hearings, and there was no evidence she failed to comply with court orders. Id. at 506. "Because a party represented by counsel may defend at a trial without being physically present, default may not be entered when a party is not present at trial absent evidence that the party has not otherwise defended as required by rule or court order." Ibid. We found the entry of default to be of "no consequence[,]" because "defendant's attorney was permitted to cross-examine the witnesses that were called and to give a closing statement[,]" and we affirmed the termination of parental rights. Id. at 510.

Under the circumstances in this case, the judge found P.G. failed to attend any of his court hearings and he failed to comply with court orders requiring him to complete services, including urine screens. P.G. also failed to appear for substance abuse evaluations on May 22, June 11, June 30, July 21, 2014, and

January 15, 2015. He commenced a substance abuse evaluation on February 12, 2015, but it was not completed because P.G. "became incarcerated shortly thereafter and was unable to undergo a second urine screen." P.G. never contacted the Division or G.B.'s resource parents to inquire about her well-being, despite the multitude of attempts the Division made to contact and locate him. Similar to our holding in P.W.R., if the judge entered the default in error here, it was inconsequential because P.G.'s attorney was present at every court hearing, cross-examined witnesses, and gave a closing statement.

The Division and the law guardian also rely upon In re Guardianship of N.J., 340 N.J. Super. 558, 560-61 (App. Div. 2001), where we upheld a default judgment against the defendant mother. There, defendant forgot about the trial date, and she failed to appear. Id. at 559. She also failed to appear at nine of the eleven prior court hearings, failed to undergo court-ordered drug evaluations, or attend a psychological evaluation. Id. at 561. Here, the judge analyzed P.G.'s reasons for his non-compliance with court orders and his failure to appear at trial and noted P.G. "appeared with counsel in the proceeding when he completed his identified surrender[,]" and P.G. was notified when the surrender "was set aside and the case was reactivated." P.G. was consistently

A-5093-17T2

noncompliant throughout these proceedings and we discern no basis to vacate default.

We are satisfied the judge's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a), accords with applicable case law, is amply supported by the record, and default was appropriately entered.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

32

A-5093-17T2