# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2478-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

L.S.-S.,

     Defendant-Appellant,

and

M.M. and V.G.,

     Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP of A.M.
and N.M., minors.

_____

Submitted July 19, 2022 – Decided August 3, 2022

Before Judges Gilson and Mayer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FG-16-0017-20.

Joseph E. Krakora, Public Defender, attorney for appellant (Catherine Reid, Designated Counsel, on the briefs).

Matthew J. Platkin, Acting Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie Goldstein, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant L.S.-S.[1] (Lilly) appeals from an April 16, 2021 judgment of guardianship after a trial terminating parental rights to her daughters, A.M. (Anna), born in October 2011, and N.M. (Nina), born in July 2009.[2] On appeal, Lilly challenges the Family judge's determination that the New Jersey Division

---

[1] We use initials and pseudonyms to protect the family's identity. R. 1:38-3(d)(12) and N.J.S.A. 9:6-8.10a(a).

[2] Anna's biological father, V.G., last known to reside in Florida, received notice of the proceedings but appeared only once during the trial. Nina's biological father, M.M., could not be located despite numerous attempts to find him as detailed in the Division's affidavit of diligent inquiry. Neither father is participating in this appeal.

of Child Protection and Permanency (Division) satisfied the second, third, and fourth prongs of the best interests of the child test, N.J.S.A. 30:4C-15.1(a).  She also contends the judge's decision "is tainted by prejudice and unfairness" as a result of proceeding virtually on the last day of trial without Lilly's consent.  We disagree and affirm.

I.

We summarize the evidence adduced during the five days of trial testimony, including voluminous documents admitted by the judge.[3]  The Division presented testimony from Maritza Jolly, a permanency caseworker, Jessica Jimenez, an adoption caseworker, and the resource parent, P.P. (Pippa).[4] Dr. Eric Kirschner, a licensed psychologist, also testified for the Division.  The Law Guardian offered the testimony of Nina and Dr. Rachel Jewelewicz Nelson, a licensed psychologist.  Lilly did not testify and called no witnesses.

---

[3]  Trial with live witness testimony proceeded on February 24, 25, 28, and March 10, 2020.  Due to the pandemic and cessation of in-person trials, the judge postponed closing arguments originally scheduled for March 25, 2020.

[4]  Pippa is Lilly's aunt.

The Division first became involved with the family in 2009. Over the next seven years, the Division received at least nineteen referrals involving Nina, Anna, and Lilly's son, J.M. (Jack),[5] born in September 2007.

The Division received reports that Lilly neglected and physically abused the children and used drugs in combination with alcohol. As a result, the Division implemented a Safety Protection Plan (Plan) and provided in-home services through the Emergency Child Aid Program (ECAP) to allow the children to remain in the home with Lilly. The ECAP found Lilly's home was filthy and infested with insects and rodents. Additionally, the ECAP determined the children lacked proper hygiene. Upon implementation of the Plan, Lilly participated in a substance abuse evaluation arranged by the Division. Based on the evaluation, the Division referred Lilly to a treatment program for drugs and alcohol but she did not attend.

Just two weeks after Lilly participated in the substance abuse evaluation, the children found Lilly unresponsive. When the Division's caseworker arrived at the home, Lilly smelled of alcohol and appeared to be under the influence of drugs. Because Lilly violated the Plan and refused to provide a drug screen, and

---

[5] Jack is diagnosed with autism spectrum disorder resulting in behavioral issues and other difficulties. At the time of the guardianship trial, Lilly had custody of Jack and he is not participating in this appeal.

the Division conducted an emergency removal of the three children in November 2016 and placed them with a maternal cousin.

On November 28, 2016, the Division was awarded custody of the children. The trial court deemed removal of the children appropriate based on Lilly's positive drug screens, refusal to participate in substance abuse treatment, the children's excessive school absences, the condition of the home, and lack of parental supervision.

In December 2016, Lilly tested positive for cocaine and opiates several times and admitted to consuming alcohol. Based on mental health evaluations conducted at the Division's request, the Division provided individual and family therapy to Lilly and the children.

Also in December 2016, the cousin who had custody of the children requested Jack be removed due to behavioral issues. Jack was placed in two other resource homes before being admitted to a psychiatric hospital in late 2016. The cousin initially agreed to keep Nina and Anna. However, the cousin decided to leave New Jersey so the Division sought to place the girls with other relatives. After ruling out eligible family members, the Division placed the girls in a non-relative resource home.

A-2478-20

On January 27, 2017, Lilly's aunt, Pippa, offered to take Anna and Nina. The Division evaluated Pippa and the girls were placed with her on March 13, 2017.

During this time period, Lilly continued to test positive for cocaine, missed several drug screens, and failed to appear for scheduled psychological evaluations. Around the same time, Anna and Nina began weekly therapy with Christine Ray. Ray reported the girls and Pippa were working toward therapeutic treatment goals.

Lilly then attended an outpatient treatment program through Door into the Future (DITF) but her attendance was sporadic and she tested positive for cocaine. DITF discharged Lilly from its program in August 2017, reporting her level of compliance as "fair."[6] DITF recommended Lilly be reassessed as a candidate for treatment after receiving medical clearance from a neurologist regarding her opiate use.

In May 2017, Lilly completed a psychological evaluation with Dr. Alison Strasser Winston. The doctor recommended Lilly complete intensive outpatient drug treatment, comply with scheduled drug screens, attend domestic violence

---

[6] DITF explained "fair" meant the client need to improve attendance in the program.

A-2478-20

counseling, submit to medication monitoring, and participate in therapeutic visitation with her daughters. Lilly refused to attend domestic violence and individual counseling.

The Division arranged for therapeutic visits between Lilly and the girls through Reconnect. Ray, the girls' therapist, recommended the visits not take place in Lilly's home based on negative experiences suffered by Anna and Nina while living with Lilly. When family visits started in August 2017, Reconnect reported Lilly was unable to control her emotions.

In August 2017, the therapist working with Anna and Nina explained the girls expressed difficulty relating to Lilly. Anna reported being afraid to tell Lilly about her feelings. Nina voiced anger at the inconsistent visits with Lilly but recognized it was "important" to maintain a relationship with her mother.

Lilly underwent a psychiatric evaluation in September 2017 and the evaluating doctor recommended "aggressive treatment" for Lilly's bipolar disorder, a mood stabilizer, and injections to avoid relapsing into alcohol use. The doctor also recommended that Lilly attend weekly individual therapy, an alcohol recovery program, parenting classes, and domestic violence counseling.

Because Lilly continued to test positive for cocaine and failed to complete domestic violence counseling and a substance abuse program, the Division

sought to terminate Lilly's parental rights to Nina and Anna and filed a guardianship complaint on November 16, 2017.

Shortly before the Division filed the guardianship action, Lilly started participating in the recommended therapies and treatment programs. After her abusive husband moved to Florida, Lilly completed domestic violence counseling in October 2018. Based on Lilly's compliance with the Division's services and treatment programs, in June 2018, the Division reverted to a reunification plan for Lilly and all three children.

Despite her progress, the Division learned Lilly had failed to take her bipolar treatment medication and her mood destabilized for several months. Subsequently, Lilly completed a substance abuse program and transferred to the facility's mental health program for further treatment. In August 2018, Lilly took her medication for bipolar disorder and remained compliant with the mental health treatment recommendations until October 2018 when the facility reported she missed five of eleven mental health sessions.

Because the Division was unable to find a suitable placement for Jack given his autism spectrum disorder, he was placed in a special residential facility for two years. Based on Jack's strong desire to leave institutional care and the insufficiency of select home adoption to meet Jack's needs, the Division

A-2478-20

determined Jack's diagnosis necessitated his living with his mother. Reconnect also recommended Lilly be reunified with her son due to Jack's specific circumstances. As part of Lilly's reunification with Jack, the Division imposed conditions for Jack's safety. In reunifying Jack and Lilly, the Division provided family therapy, in-home parent monitoring, gradual unsupervised visitation and, eventually, overnight visits.

Despite Lilly's reunification efforts with Jack, neither Lilly nor the girls were ready to be reunified. Lilly completed a psychological evaluation in October 2018 with Dr. Eric Kirschner. Based on his evaluation, Dr. Kirschner had concerns regarding Lilly's ability to meet the "children's needs for safety, stability, and guidance." As of the date of the evaluation, Dr. Kirschner could not recommend reunification for Lilly and the girls. However, Dr. Kirschner recommended reunification for Jack and Lilly provided mother and son receive in-home services and Lilly participate in long-term mental health treatment.

After declining numerous visits with their mother in 2017 and 2018, Anna and Nina refused to visit with Lilly as of October 2018. When Lilly visited with the girls prior to October 2018, she discussed the Division's case and her personal issues. When Lilly did visit with Anna and Nina, the visitation specialist had to instruct Lilly to focus on the children's needs and respond to

9

the girls' behaviors. Lilly knew the girls refused to visit with her but failed to acknowledge that she may have been responsible for their refusal.

In August 2018, the Family judge ordered family therapy for the girls and Lilly. However, at the recommendation of the treating therapist, the judge suspended the order to allow Nina and Anna to participate in individual therapy sessions before scheduling sessions with Lilly. Family therapy sessions were then scheduled to start in November 2018. The girls attended one session and then refused to participate, stating they had no desire to return to Lilly's custody.

Jack and Lilly were reunified on November 21, 2018. One week later, Lilly relapsed by using cocaine. Rather than remove Jack again, the Division implemented a safety plan requiring Lilly to submit to drug screens and comply with the Division's random safety checks. On December 5, 2018, Lilly tested positive for cocaine. The Division allowed Jack to remain with Lilly and provided additional services to assist Lilly in caring for Jack and to address her substance abuse problems.

On March 18, 2019, the Division removed Jack because Lilly tested positive for cocaine. About a week later, Lilly tested negative for cocaine and agreed to the Division's implementation of another safety plan where Lilly's niece would supervise interactions between Jack and Lilly. A week after the

implementation of the new safety plan, Lilly tested positive for alcohol. Thereafter, Lilly missed several substance abuse screens. Lilly's drug and alcohol relapses supported the Division's decision against reunification for Lilly, Nina, and Anna.

In April 2019, the Division reinstated family therapy. Nina, Anna, and Lilly attended three sessions. Lilly was late to the second session. By the third session, the girls were "emotionally dysregulated" and declined to participate after fifteen minutes. At this session, Lilly told the program facilitator she would leave New Jersey once the Division closed the case and the girls would never see Pippa again. The facilitator found Lilly's statements troubling especially because Pippa supported the family for many years. The facilitator recommended Pippa participate in the family therapy sessions with the girls. With Pippa's participation, but without Lilly, the girls were able to voice their feelings and concerns.

Lilly told the Division she would consider Kinship Legal Guardianship (KLG) for Pippa but not adoption. Lilly believed Pippa directed the girls to refuse to participate in family therapy. If Pippa would not agree to KLG, then Lilly requested Anna and Nina be placed with a cousin in Long Island. However, Lilly told Dr. Kirschner her daughters were "safe" and "in the best

11

place" with Pippa but Lilly remained unwilling to relinquish her parental rights so Pippa could adopt the girls. Under a KLG plan, Lilly stated her intent to return to court in a year or two to regain custody of Nina and Anna.

The Division discussed KLG with Pippa. Pippa also spoke to an attorney about KLG. After these discussions, Pippa declined KLG as an option. Pippa reaffirmed her commitment to adopting the girls and signed the Division's adoption/KLG fact sheet.

On May 21, 2019, the Division told the court it would seek to terminate Lilly's parental rights to Anna and Nina. As part of the Division's expressed intent to pursue termination, the judge ordered the Division to resume family therapy and therapeutic visits with Lilly.

At the last scheduled court-ordered therapy session, Lilly told the facilitator that if the girls refused to participate, she was "done trying." The girls refused to attend the scheduled therapy session.

On July 26, 2019, the Division filed a guardianship complaint. At Lilly's request, the Family judge ordered the Division to find another, more credentialed, family therapist.

In August 2019, the family therapy facilitator reported concern for the girls' safety because Lilly was "unable to maintain healthy emotional and

physical boundaries." Lilly also said she would continue drinking, demonstrating an unwillingness to refrain from substance abuse for the benefit of her children. The facilitator recommended discontinuing family sessions based on Lilly's statements and behaviors.

In September 2019, a new family therapist, Dr. Leslie Trott, began sessions with the family, including Jack. Dr. Trott noted all participants were receptive to the therapy but explained Lilly had difficulty redirecting inappropriate behaviors. Dr. Trott suspected, but could not prove, the girls were being influenced regarding their participation in family therapy.

Dr. Kirschner opined that forced participation in family therapy against the girls' wishes "may only serve to increase their resistance to doing so and also decrease the likelihood of treatment success." Despite Dr. Kirschner's opinion, the Family judge ordered continued family therapy with the new therapist. However, the girls declined to participate.

The guardianship trial began in February 2020 with witnesses testifying in person on four non-consecutive dates.

Maritza Jolly

Jolly, the Division's permanency caseworker, was assigned to the family prior to the girls being transferred to the adoption unit. Her first involvement

with the girls arose from a 2016 referral to the Division because Lilly tested positive for cocaine. She described Lilly's home as dirty. She also testified the girls were frequently absent from school.

Jolly told the Family judge about the Division's efforts to place the girls with family members. She explained why the various family members were ruled out as suitable placements. Ultimately, the Division placed the girls with Pippa in 2017.

Jolly also described Lilly's referrals and admissions to various programs offered through the Division. Initially, Lilly would be compliant and attend substance abuse programs and mental health counseling. However, Lilly frequently relapsed, and was discharged from the treatment program. Additionally, Lilly attended scheduled mental health counseling.

### Jessica Jimenez

Jimenez, the Division's adoption caseworker, supervised many visits between Lilly and the girls. Jimenez noted there were only a limited number of visits between Lilly and her daughters that she would describe as good interactions. According to Jimenez, communications between Lilly and Pippa deteriorated because of Lilly's behaviors. Jimenez explained the girls eventually

refused to continue family therapy with Lilly and the therapist recommended ceasing the sessions.

Both Division caseworkers inspected Pippa's home and found it clean and stocked with food for the girls. The caseworkers also interviewed the girls and Pippa on many occasions. Neither Division employee heard Pippa speak negatively about Lilly. They explained Pippa helped the girls with homework and attended several family therapy sessions at the suggestion of the family therapist.

Nina

According to Nina, she and her sister were removed from the family home because Lilly "would sleep all day. She did drugs and wouldn't take care of [the girls]." Nina told the judge where in the apartment Lilly hid her drugs. She also described the filthy living conditions in Lilly's home. Nina believed Lilly would continue to abuse drugs if she and Anna were returned to their mother. Nina also told the judge she wanted to be adopted by Pippa. Nina explained she would be upset if she had to live with Lilly and had no desire to see her mother, even if that meant Nina would not be able to see Jack.

15

Pippa

Pippa often visited the children when they lived with Lilly and brought food. Pippa saw Lilly hit the children during visits to the apartment when the children lived with Lilly.

After the girls were placed in her care, Pippa described how Nina and Anna would act out after visits with Lilly. According to Pippa, it would take several days for the children to return to their usual behaviors after visiting with their mother. Both girls told Pippa they did not want to visit or speak with Lilly. Pippa denied any effort to alienate the girls from their mother.

Pippa also explained why she rejected KLG. In the event something happened, Pippa was concerned the girls would return to foster care or to Lilly. Pippa further testified the Division discussed the KLG option with her. Pippa told the judge she did not want KLG and reiterated her desire to adopt Nina and Anna because she loved the girls and wanted them to be happy.

Dr. Kirschner

Dr. Kirschner, a psychologist with expertise in parenting and bonding, evaluated Lilly in October 2018 and January 2020. The doctor opined Lilly appeared tearful, irritable, angry, defensive and "resistant to participating in the evaluation process." He diagnosed Lilly with "bipolar disorder, cocaine use

16

disorder," and other unspecified diagnoses. Dr. Kirschner had concerns about Lilly's "ability to . . . manage her emotions," "tolerate frustration," judgment and impulse control, and ability to provide a safe and stable environment for the girls.

Dr. Kirschner recommended reunification for Jack and Lilly but not with Nina and Anna because "the situation with the children appear[ed] to be very different . . . ." Because of Jack's autism spectrum disorder, Dr. Kirschner identified distinct challenges finding an appropriate placement for Jack. According to Dr. Kirschner, Jack's autism impacted his ability to form new attachments, making it difficult to find a suitable adoptive home. Additionally, Jack had been in an institutional facility for two years and wanted to return to Lilly.

Shortly after Jack returned to Lilly's care, she relapsed and Lilly's relapse concerned Dr. Kirschner. The doctor explained dealing with a special needs child was difficult by itself. He opined caring for two additional children could overwhelm Lilly, causing her to further relapse by abusing drugs and alcohol.

Dr. Kirschner observed the girls' interactions with Lilly during the bonding evaluation. He reported "there wasn't a whole lot of affection or closeness or physical comfort that was exhibited." Dr. Kirschner found Lilly

was not "a source of emotional support and safety and security," and neither girl had a secure attachment to their mother so "they would not suffer serious and enduring harm if the relationship was to be terminated."

In his evaluation of the girls and Pippa, Dr. Kirschner noted there were "no signs of reluctance or anxiety or unease . . . ." The doctor explained the girls had a strong bond with Pippa. He noted Pippa served as the "psychological parent" for Anna and Nina. He concluded the girls would suffer serious harm if removed from Pippa's care and Pippa could mitigate any harm to the girls if the judge terminated Lilly's parental rights. Additionally, Dr. Kirschner did not believe Pippa coached the girls regarding their interactions with Lilly.

Dr. Rachel Jewelewicz Nelson

Dr. Nelson testified on behalf of the Law Guardian as an expert in parental fitness, child development, bonding, and attachment.

Dr. Nelson recognized Lilly suffered from bipolar disorder. The doctor also explained Lilly had narcissistic and antisocial tendencies. Lilly also told Dr. Nelson she intended to leave New Jersey "with or without the girls." At one point, Lilly confided to the doctor that she was willing to take Anna without Nina because Lilly felt more connected to Anna. This statement concerned Dr. Nelson because it revealed Lilly viewed the girls "as objects" without any

recognition of the girls' needs.  In her assessment, Dr. Nelson concluded termination of Lilly's parental rights would not do more harm than good because the girls lacked a secure attachment to their mother and did not feel safe with Lilly.  Dr. Nelson stated Anna and Nina were "at risk for developing emotional and mental health problems" if returned to Lilly's care.

Regarding Lilly's ability to parent the girls, Dr. Nelson told the judge "[j]ust because she can theoretically handle [Jack] . . . [did] not necessarily mean that she can parent any child."  According to Dr. Nelson, "now or in the foreseeable future," Lilly lacked "the capacity to safely and properly parent" the girls.

In her evaluation of Nina and Anna, Dr. Nelson sought to determine whether termination of Lilly's parental rights would do more harm than good. The doctor concluded both girls were resilient and had the capacity to decide between reunification with Lilly or adoption by Pippa.  Anna and Nina unequivocally expressed their desire to be adopted by Pippa.  Because Lilly lacked the ability to safely parent Anna and Nina, Dr. Nelson opined termination of Lilly's parental rights would not do more harm than good.

Dr. Nelson also met with Pippa.  Nina and Anna were affectionate toward Pippa and responded to Pippa's directions as the "clear parent figure."  The

19

doctor also discussed KLG with Pippa, found Pippa gave that option "considerable thought," and Pippa preferred to adopt the girls.

At the conclusion of the live testimony, the Family judge scheduled closing arguments for March 25, 2020. Due to the COVID-19 pandemic, in-person trials were suspended and the judge postponed closing arguments.

During suspension of the guardianship trial, the Division provided the Family judge with updates regarding Lilly's compliance with treatment programs, medication, and counseling. The Division also gave status reports on the girls' progress.

After several months, when it appeared in-person trials would not resume in the near future, the Division asked if the judge would allow written summations. However, Lilly objected because she wanted to present additional testimony.

Lilly advised she sought to recall Jimenez for testimony limited to the preparation of the Division's written report before the judge ruled on the admissibility of that report. Additionally, Lilly wanted Jimenez to present updated testimony related to Lilly's ability to parent the girls since the last in-person proceeding in March 2020. Lilly objected to proceeding virtually with Jimenez's limited testimony and closing arguments.

A-2478-20

The judge recognized the New Jersey Supreme Court's COVID-19 orders precluded proceeding virtually or telephonically absent the parties' consent. Lilly refused to consent. The Division and Law Guardian objected to continued deferral of the matter because there was no clear date when in-person proceedings would resume and delaying trial indefinitely deprived Nina and Anna of permanency and stability.

After many case management and status conferences, in December 2020, the judge proposed completing the trial in a virtual format because "substantive testimony ha[d] already occurred" and all that remained was an update from Jimenez and closing arguments. In addressing Lilly's concerns regarding a virtual trial, the judge provided a breakout room for Lilly to confer with her counsel. As for Lilly's concern Jack might hear some testimony in a virtual hearing, the judge explained Lilly could wear headphones or have someone watch Jack during the virtual proceeding. Moreover, the judge noted Lilly would not be testifying during the virtual hearing. The only witness at the virtual trial, Jimenez, would provide limited testimony on events since the last in-person appearance in March 2020. Further, the judge stated resolution of a permanent placement for Anna and Nina had been delayed far too long and the girls were entitled to a decision whether to terminate Lilly's parental rights.

21

The trial proceeded virtually on January 6, 2021. According to Jimenez, Lilly's compliance with programs remained "fair." Lilly missed several screens between March 2020 and January 2021 and tested positive for alcohol in July 2020. Jimenez maintained telephone contact with Pippa and the girls until in-person visits by the Division resumed in July 2020. Jimenez testified the girls remained adamantly opposed to family therapy and wanted no contact with Lilly despite encouragement from Jimenez to do so and Pippa's openness to visits with Lilly. Jimenez also reported Lilly missed several parenting skill classes between March 2020 to January 2021 and the Division continued to monitor Jack and Lilly for compliance with the conditions of their reunification.

After Jimenez testified, the Family judge admitted the remaining documentary evidence without objection. Counsel gave closing arguments virtually.

## II.

On April 16, 2021, in an oral decision, the judge terminated Lilly's parental rights. The Family judge found the witnesses for the Division and Law Guardian testified credibly. She described each witness "maintained appropriate eye contact, appeared comfortable and forthcoming and informative." The judge also noted "[e]ach witness presented with an adequate ability to recall events

22

that occurred throughout the Division's involvement with the family, and in terms of personal involvement with the parties involved." The judge provided a detailed analysis of the witnesses' testimony. Based on the testimony and documentary evidence, the judge found the Division met its burden under all four prongs of the best interests test, proffering clear and convincing evidence supporting termination of Lilly's parental rights.

Under the first and second prongs of the best interests test, N.J.S.A. 30:4C-15.1(a)(1) and (2), the judge found the girls' health and development were endangered by Lilly's relationship and termination of Lilly's parental rights would not do more harm than good. The judge identified the harm faced by the girls due to Lilly's substance abuse and her inability to care for and properly parent them. Citing Dr. Kirschner's testimony, the judge noted the "girls had come to view [Pippa] as their psychological parent, and that they would suffer a loss that would produce significant and enduring harm if they were to be separated from [Pippa]." Based on Dr. Kirschner's testimony, the judge stated Nina and Anna "continued to be opposed to supervised visitation or family therapy with their mother, let alone reunification with her." The judge accepted Dr. Kirschner's opinion that Lilly lacked the ability to parent the girls and would be unable to mitigate harm to them if the family was reunified.

23

Similarly, the judge accepted Dr. Nelson's unrebutted testimony that Lilly lacked the capacity, presently or in the future, to safely and properly parent Anna and Nina. As a result of Lilly's failure to understand her psychiatric status and acknowledge her need to address her drug addiction, the judge agreed with Dr. Nelson's conclusion Lilly was "at greater risk for relapse and return to substance abuse, as well as an increased risk for child neglect."

Based on the testimony of the experts, the judge concluded Lilly was unwilling or unable to eliminate harm to the children and provide them with a safe and stable home. She found Lilly "lack[ed] insight as to her psychiatric and psychological status, [was] looking to cease recommended medication upon closure of the case, and has self-medicated with the use of [illicit] drugs to address psychiatric issues." The judge determined Lilly's lack of understanding as to these issues "place[d] her at a greater risk to relapse and turn to drug abuse, as well as an increased risk for child neglect." The judge explained:

> [Lilly's] harm to the girls [was] caused by her use and abuse of [illicit] drugs, and according to [the] doctors' testimony and evaluations, she is unable to properly care for, parent and protect the girls. The harm caused to the girls by way of [Lilly's] drug use, neglect and reported physical abuse, created a sense of unattachment, insecurity, lack of trust and fear. Such is reflected in their behavior, their interaction with [Lilly], as well as the data gathered by the doctors.

24

Based on these findings, the judge concluded the Division satisfied its burden under the first and second prongs of the best interests test.

Under the third prong, N.J.S.A. 30:4C-15.1(a)(3), the judge addressed the Division's efforts to provide services to Lilly and the Division's consideration of alternatives to termination of parental rights. The judge found the Division offered services to Lilly, including "drug evaluations and treatment, psychiatric and psychological evaluations of treatment, domestic violence classes, parenting classes, supervised visits, family counseling and transportation."

The judge noted Lilly's treatment progress was described as "fair." While Lilly attended some parenting programs, the judge stated Lilly was discharged for failing to report for appointments. Lilly also attended family therapy until the sessions were terminated at the suggestion of the family therapist and other medical experts.

Responding to Lilly's allegation the girls were "coached" to reject family counseling and behave negatively toward Lilly, the Division questioned Pippa about Lilly's claim. Pippa denied "coaching the girls or encouraging bad behaviors and negative feelings towards [Lilly]." The girls also told the Division caseworkers and Dr. Nelson that no one "influenc[ed] their behavior or feelings towards [Lilly]." While recognizing coaching and influencing were

"definitely a possibility," the judge found "there [was] no concrete evidence, nothing more than a suspicion, that ha[d] been presented to the [c]ourt."

Additionally, the judge had the opportunity to observe Nina's behavior on at least one trial date. The judge noted Nina "appear[ed] to be of a strong will and committed to her desires and position regarding her relationship with [Lilly]." The judge found both girls stopped attending counseling despite the Division encouraging them to do so. Moreover, the judge accepted the testimony of the medical experts who "advised against forcing the girls to attend the therapy." Dr. Kirschner opined forcing the girls to participate in family therapy with Lilly "would be counterproductive to any positive therapeutic outcome." The judge concluded "reasonable efforts were definitely made to pursue [the Division's] initial goal of reunification" by arranging for family counseling, securing "a Ph.D level therapist for the counseling due to the complex nature of the relationship," and continuing "to encourage the girls to attend therapy, even after the doctors recommended against it . . . ."

After considering alternatives to termination, the judge determined "[r]eunification [was] not feasible or in the best interest of the girls, based upon the expert's recommendation and evaluations." She also found "[a] kinship legal guardianship arrangement is likely to be unsuccessful based upon the girls'

26

feelings and behaviors and the tensions that exist between [Lilly] and the resource parent." Based on the trial evidence, the judge found Pippa understood KLG, "and did not wish to pursue it." Pippa told the judge, "the girls wanted to be adopted, she wanted to adopt them, and she was concerned that should something happen to her, the girls would be returned to the foster care system or to [Lilly]."

Regarding the biological fathers, the judge found Nina's father "never participated in this litigation," had only "a couple of visits with the girls," and "his whereabouts remain unknown." As for Anna's father, the judge found he "was more active in the litigation and was in contact with the Division at different points of the litigation . . . " At the beginning of the trial, Anna's father appeared remotely from his home in Florida, "but failed to complete a 5A application for representation during the trial." Even after the Division notified him of the litigation and the process for completing a 5A application for assignment of counsel, Anna's father "failed to attend the remainder of the trial."

Based on the foregoing findings, the judge held the Division met its burden under the third prong of the best interests test.

Under the fourth prong of the statute, N.J.S.A. 30:4C-15.1(a)(4), the judge found neither girls had a secure bond with Lilly because the girls could not "trust

and rely upon" their mother "to meet their needs for safety[,] protection and security." Because the judge concluded the girls formed a strong bond with Pippa, she found Anna and Nina "would be vulnerable to experience serious and enduring psychological harm or trauma if they were to be removed" from Pippa's care. The judge also noted the girls were strongly opposed to supervised visitation and family therapy with Lilly and wanted Pippa to adopt them.

After finding the Division satisfied its burden under all four prongs of the best interests test, the judge terminated Lilly's parental rights and entered default judgments terminating the parental rights of the biological fathers.

III.

On appeal, Lilly contends the judge erred in finding the Division met its burden of proof on the second, third, and fourth prongs of the best interests test. Lilly also claims the judge failed to consider alternatives to termination of her parental rights and the decision was "marred by unfairness, the appearance of prejudice and disregard for the circumstances of defendant-parents" by proceeding with the trial virtually absent her consent. We reject Lilly's arguments.

Our review of the judge's decision is limited and we defer to his or her expertise as a Family judge. Cesare v. Cesare, 154 N.J. 394, 413 (1998). We

are bound by his or her factual findings so long as the findings are supported by sufficient credible evidence. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). "[W]e [also] rely on the trial court's acceptance of the credibility of the expert's testimony and the court's fact-findings based thereon, noting that the trial court is better positioned to evaluate the witness' credibility, qualifications, and the weight to be accorded [his or] her testimony." In re Guardianship of D.M.H., 161 N.J. 365, 382 (1999) (citing Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 607 (1989)).

Parents have a constitutionally protected right to raise their biological children. In re Guardianship of J.C., 129 N.J. 1, 9-10 (1992) (citing Santosky v. Kramer, 455 U.S. 745, 753 (1982)). The State may protect the welfare of the children where the parent is unfit or the child has been harmed. Id. at 10. To prevail in a termination proceeding, the Division must establish, by clear and convincing evidence, each element of the "best interests test." Id. at 9.

Under the "best interests test," N.J.S.A. 30:4C-15.1(a),[7] the Division must satisfy the following prongs:

---

[7] The Legislature amended the statute in July 2021, eliminating the second sentence of N.J.S.A. 30:4C-15.1(a)(2). The amendment took effect after the

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

Prong Two

Lilly argues the Family judge erred in finding she was unwilling or unable to eliminate harm to Anna and Nina or provide them with a stable home. She asserts the Division granting her custody of Jack is at odds with its position regarding custody of Anna and Nina.

---

issuance of the April 16, 2021 judgment of guardianship that is the subject of this appeal.

Under the second prong of the best interests test, the judge must determine whether the parent cured and overcame the initial harm that endangered the child, and whether the parent is able to continue the parental relationship without recurrent harm to the child. In re Guardianship of K.H.O., 161 N.J. 337, 348-49 (1999).

Our Supreme Court has cautioned that "[m]ental illness, alone, does not disqualify a parent from raising a child." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 450 (2012). "But it is a different matter if a parent refuses to treat his mental illness [and] the mental illness poses a real threat to a child . . . . ." Id. at 450-51; see also N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104-05 (2008) (upholding termination where the mother repeatedly relapsed into addiction, resulting in homelessness, unemployment, and a prison sentence); N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 512 (2004) (supporting termination where the drug-addicted parents had not completed treatment and did not have stable housing); K.H.O., 161 N.J. at 349 (finding termination where addiction prevented the parent from "providing care and nurture or a stable home"); N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 224 (2013) (deeming termination proper where the father enrolled

in drug treatment programs but "routinely failed to complete them with positive results").

Here, the Family judge found the evidence established Lilly refused to participate in various therapies and treatments for her substance abuse and mental health issues.  When Lilly did agree to enroll in certain programs, she either missed sessions or tested positive for cocaine.  Additionally, Lilly denied needing medication or treatment for drug use and mental illness.  Based on the testimony, the judge concluded Lilly struggled with drug abuse and mental health issues, rendering her unable or unwilling to provide a safe and stable home for Nina and Anna.

The judge further concluded the Division made reasonable efforts to provide family therapy for Lilly and the girls.  After Lilly requested a more experienced family therapist to work with the family, the judge entered an order compelling the Division to find a suitable therapist.  Consistent with this order, the Division found a more credentialed therapist to work with the family. However, the girls ultimately chose not to continue family  therapy with Lilly. The therapists who worked with the girls opined it would be counterproductive to force Anna and Nina to participate in therapy.  While Lilly argues the girls

32

were "coached" to decline family therapy, her allegation is unsupported by any evidence in the record.

Based on the unrebutted evidence, we are satisfied Lilly's unwillingness to complete recommended treatment programs for mental health issues and substance abuse, regularly take her medication for bipolar disorder, and participate in other services offered by the Division, caused the girls harm and deprived them of chance to live in a stable and safe home environment.

We recognize Lilly has been reunified with Jack. However, the reunification of mother and son has not been problem-free. Lilly relapsed several times, using cocaine, after Jack was returned to her custody. Additionally, given Jack's autism diagnosis, his situation for reunification is dissimilar from reunification between Lilly and the girls. Raising a child with autism spectrum disorder poses its own unique difficulties. In fact, Lilly relapsed by abusing substances soon after she regained custody of Jack because Lilly became "overwhelmed." As Dr. Kirschner testified, Lilly was unlikely to be able to handle the stresses associated with caring for two additional children while attending to Jack's special needs and behavioral issues.

Based on the unrefuted trial testimony and documentary evidence, we are satisfied the Division met its burden under second prong of the best interests test.

Prong Three

Lilly argues the judge erred in finding the Division made reasonable efforts to provide services in support of reunification. She asserts the Division focused its efforts on her substance abuse problems but ignored providing services designed to "reinforc[e] the family structure" under N.J.S.A. 30:4C-15.1(c). Moreover, Lilly contends the girls were placed with a relative who opposed reunification. She also claims, without supporting evidence, that Pippa undermined efforts to have the girls participate in family therapy sessions.

Under the third prong, the Division must: (1) work with parents to develop a plan for services; (2) provide the necessary services; (3) facilitate visitation; and (4) notify parents of the children's progress during an out-of-home placement. N.J.S.A. 30:4C-15.1(c). The third prong "contemplates efforts that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into foster care." K.H.O., 161 N.J. at 354. Reasonable efforts depend upon the facts and circumstances of each case. D.M.H., 161 N.J. at 390. "The

diligence of [the Division]'s efforts . . . is not measured by their success," but rather "against the standard of adequacy in light of all the circumstances." Id. at 393.

Here, the evidence in the record fully supported the judge's finding that the Division made reasonable efforts to assist Lilly in overcoming the circumstances. The Division repeatedly referred Lilly for substance abuse and mental health evaluations and treatments, individual counseling, domestic violence counseling, and parenting services. The Division also facilitated visitations between the girls and Lilly and provided transportation for the scheduled family therapy sessions.

On this record, we are satisfied the Division made reasonable efforts to provide Lilly with recommended services and treatment for her mental health and substance abuse issues. Lilly either stopped participating in the recommended programs or the service providers discharged her for failing to comply with the program's requirements.

Additionally, the third prong requires the judge to consider alternatives to the termination of parental rights. KLG is an alternative that allows a relative to become the child's legal guardian and commit to care for the child until adulthood, without stripping the parents of their rights. P.P., 180 N.J. at 508.

The Legislature created KLG, finding "an increasing number of children who cannot safely reside with their parents are in the care of a relative or a family friend who does not wish to adopt the child or children." N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 222-23 (2010). Lilly contends the judge failed to consider alternatives to termination and did not appropriately evaluate the KLG option.

Prior to July 2, 2021, KLG was considered "a more permanent option than foster care when adoption '[was] neither feasible nor likely.'" P.P., 180 N.J. at 512-13 (emphasis added) (quoting N.J.S.A. 3B:12A-6(d)(3) to (4)). "[W]hen a caregiver . . . unequivocally assert[ed] a desire to adopt," the standard to impose a KLG was not satisfied because the party seeking a KLG arrangement would not be able to show that adoption was neither feasible nor likely. N.J. Div. of Youth & Family Servs. v. T.I., 423 N.J. Super. 127, 130 (App. Div. 2011).

On July 2, 2021, the Legislature enacted L. 2021, c. 154, which removed the KLG requirement that adoption be "neither feasible nor likely." P.P., 180 N.J. at 512-13 (quoting N.J.S.A. 3B:12A-6(d)(3) to (4)). Under the amended statute, KLG may be a valid defense to the termination of parental rights, even when adoption is available as an option. See N.J.S.A. 3B:12A-5. Lilly argues retroactive application of this legislative change is warranted because the

Legislature indicated the amendment was to "take effect immediately." We disagree.

Our Supreme Court has held newly enacted legislation with "effective immediately" language supports prospective intent in applying the statute. See Pisack v. B&C Towing, Inc, 240 N.J. 360, 371 (2020) (quoting Cruz v. Cent. Jersey Landscaping, Inc., 195 N.J. 33, 48 (2008)) (explaining that an amended statute's immediate effective date "bespeak[s] an intent contrary to, and not supportive of, retroactive application").

Regardless of whether the statute as amended applies retroactively, the judge found Pippa expressly understood the KLG alternative after discussions with the Division and her attorney. Based on those discussions, Pippa unequivocally rejected KLG, stating she wished to adopt Anna and Nina. We are satisfied the judge appropriately concluded Pippa's adoption of the girls was the best, most viable, and appropriate option because Pippa would provide a realistic chance for Nina and Anna to achieve a permanent and stable home environment.

Prong Four

With respect to fourth prong, Lilly argues the judge erred in concluding termination of her parental rights would not do more harm than good. Lilly

37                                                                                  A-2478-20

claims the judge's findings on the fourth prong overlooked the Division's failures to foster a parent-child relationship.

Under the fourth prong, the overriding consideration is the child's need for permanency and stability. See K.H.O., 161 N.J. at 357. "The question to be addressed under [the fourth] prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [the child's] natural parents than from the permanent disruption of [the child's] relationship with [the child's] foster parents." Id. at 355.

In weighing any potential harm arising from terminating a parent's rights against separating a child from his or her resource parent, a court must consider expert testimony on the strength of each relationship. J.C., 129 N.J. at 25. "[W]here it is shown that the bond with foster parents is strong and, in comparison, the bond with the natural parent is not as strong, that evidence will satisfy . . . N.J.S.A. 30:4C-15.1(a)(4)." K.H.O., 161 N.J. at 363.

The judge had sufficient credible evidence that termination of Lilly's parental rights would not do more harm than good. That evidence included the unrebutted testimony of two experts, who both opined that termination of Lilly's parental rights would not do more harm than good. Based on the evidence and testimony, the judge properly concluded Pippa, as the girls' psychological parent

38

for nearly four years, would provide Anna and Nina with the stable and permanent home they deserved.

In light of the overwhelming and uncontradicted evidence, we are satisfied the judge correctly concluded the Division presented clear and convincing evidence in support of termination of Lilly's parental rights to Nina and Anna under N.J.S.A. 30:4C-15.1.

IV.

We next consider Lilly's argument that proceeding with the last day of limited trial testimony and closing arguments in a virtual format was unfair and prejudicial. We reject that argument.

At the conclusion of the testimony on March 10, 2020, the judge scheduled closing arguments for March 25, 2020. However, in-person proceedings were suspended on March 20, 2020 due to the pandemic. As a result, the judge postponed closing arguments.

Because the return to in-person proceedings remained uncertain and a permanent home for Anna and Nina continued to be in limbo, the judge suggested the trial proceed virtually. However, Lilly objected to proceeding virtually. Additionally, Lilly sought to recall Jimenez to testify with updated information regarding her treatment and therapy progress since March 2020.

By December 2020, over Lilly's objection, the judge decided to proceed virtually. By that date, the judge was familiar with virtual proceedings and expressed confidence the guardianship trial could be completed without violating Lilly's right to due process. The judge noted the testimony sought by Lilly prior to closing arguments would be brief and limited to updating the court on Lilly's status since March 2020. While Lilly voiced concern regarding her ability to confer with counsel in a virtual format, the judge explained a breakout room would allow communications between Lilly and her attorney in the same manner as if the matter proceeded live in the courtroom.

Lilly also worried Jack would overhear the virtual proceeding and become upset. In addressing Lilly's concern, the judge found Lilly could wear headphones or, alternatively, have someone supervise Jack.

Our Supreme Court recently recognized virtual proceedings were implemented as a temporary measure under the pandemic because "the criminal and civil justice system cannot stand still." State v. Vega-Larregui, 246 N.J. 94, 136 (2021). Even prior to the pandemic, we established factors to be considered by courts in determining whether to allow witnesses to testify via video rather than in person. See Pathri v. Kakarlamath, 462 N.J. Super. 208, 212 (App. Div. 2021). In assessing the fairness of proceeding with trial testimony by video

rather than in person, we explained a court should consider, among other factors, "the witness' importance to the proceeding [and] the severity of the factual dispute to which the witness will testify," "whether the factfinder is a judge or a jury," and "the delay caused by insisting on the witnesses' physical appearance in the court versus the speed and convenience of allowing the transmission in some other manner." Id. at 216.

Here, the matter was not complex. But for Lilly's request to recall Jimenez to testify briefly regarding Lilly's compliance with services and programs after March 2020, all other testimony had been presented in person. The judge also made accommodations to address Lilly's concerns about proceeding remotely. Lilly's attorney had an opportunity to cross-examine Jimenez about events after March 2020. More importantly, as of January 2021, Anna and Nina had been removed from Lilly's care for nearly four years. Further, because of the pandemic, the guardianship trial had been suspended for nine months and a date for returning to in-person court proceedings was highly uncertain. The judge concluded Anna and Nina deserved to have a stable and permanent home after four years.

Significantly, Lilly failed to assert how proceeding virtually resulted in prejudice. The direct and cross-examination of Jimenez spanned approximately

41

thirty transcript pages, including counsels' objections and the judge's rulings on those objections. Lilly's attorney thoroughly cross-examined Jimenez regarding her updated testimony. Lilly also had the ability to confer with her attorney regarding Jimenez's limited testimony on recall. Based on our review of the transcript from the January 6, 2021 trial date, it does not appear Jack disrupted the virtual proceeding or impacted Lilly's ability to participate in the trial.

Given the pressing need to find a permanent and stable home for Anna and Nina based on the length of time since they were removed from Lilly's care, we are satisfied the virtual format of the last day of trial was not unfair or prejudicial, and did not violate Lilly's right to due process. Under the circumstances, the Family judge did not abuse her discretion in proceeding with limited testimony and closing arguments remotely.

To the extent we have not addressed any of Lilly's remaining arguments, we concluded they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION