# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0917-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.L.C.,

     Defendant,

and

L.T.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF E.J.C.
and L.J.T., minors.

_____

Submitted November 9, 2023 – Decided November 20, 2023

Before Judges Firko and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FG-01-0008-22.

Joseph E. Krakora, Public Defender, attorney for appellant (Louis W. Skinner, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sara M. Gregory, Assistant Attorney General, of counsel; Alicia Y. Bergman, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie E. Goldstein, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant L.T. (Luke)[1] appeals from the November 3, 2022 order terminating his parental rights to his minor children, E.J.C. (Eric), and L.J.T. (Logan).[2] The Law Guardian supported termination. Luke contends the Family Part judge misapplied the "best interests" statutory test, N.J.S.A. 30:4C-15.1(a).

---

[1] We use initials and fictitious names to refer to the parties and their children. R. 1:38-3(d)(12).

[2] The Family Part order also terminated the parental rights of the children's mother, J.L.C. (Jackie), who voluntarily surrendered her parental rights to Julia and Doug, the maternal grandparents. Jackie does not appeal from the termination of her parental rights.

After a careful review of Luke's contentions in light of the record and applicable principles of law, we affirm.

I.

Eric

Eric was born in 2014. In October 2016, the Division of Child Protection and Permanency (the Division) became involved with the family because of domestic abuse inflicted upon Eric's infant maternal half-brother.[3] Jackie and the infant's father were substantiated for abuse.[4] Eric and the infant were removed from the home.[5] Eric was placed in the Division's custody because Luke could not be located. Several months later, Eric was placed with his maternal grandparents, Julia and Doug.

---

[3] Eric and Logan have half-siblings who are not involved in this guardianship matter.

[4] An allegation shall be "substantiated" if the preponderance of the evidence indicates that a child is an "abused or neglected child" as defined in N.J.S.A. 9:6-8.21 and either the investigation indicates the existence of any of the circumstances in N.J.A.C. 3A:10-7.4 or substantiation is warranted based on consideration of the aggravating and mitigating factors listed in N.J.A.C. 3A:10-7.5.

[5] A "Dodd removal" is the immediate removal of a child from the home without a court order, permissible by statute where the Division perceives a child is subject to an "imminent risk of harm" pursuant to N.J.S.A. 9:6-8.28.

3

The Division learned that Luke was incarcerated in West Virginia on drug-related offenses and a charge of aggravated assault with a deadly weapon. Luke's criminal history included prior drug charges and domestic violence charges, including domestic violence against Jackie, who told law enforcement Luke was her "pimp."

While incarcerated, Luke participated in programs designed to address his anger management, reentry into society, and parenting skills. Luke also engaged in programs pertaining to gang intervention, life skills, and employment and participated in one-on-one therapy. After Luke was released in December 2017, the Division arranged for evaluations, recommended programs, and planned weekly visits with Eric. In January 2018, Luke met Eric for the first time. For the next several months, Luke repeatedly tested positive for opiates, oxycodone, marijuana, and alcohol.

On February 18, 2018, Dr. Alan J. Lee, a clinical psychologist, conducted a psychological evaluation of Luke and bonding evaluations between Eric and Luke and Eric and his maternal grandparents. Dr. Lee determined Eric had a significant psychological attachment with his maternal grandparents and an insecure and ambivalent attachment with Luke. Dr. Lee opined Eric would be at a high risk of suffering severe and enduring harm if his relationship with his

A-0917-22

maternal grandparents ended and a low risk of suffering severe and enduring harm if his relationship with Luke permanently ended.

Dr. Lee reported that Luke told him about his arrests as an adult and three incarcerations. Luke admitted to using a weapon—a knife—against two people and acknowledged his domestic violence history. Luke reported to Dr. Lee that he used illicit drugs—"wet,"[6] molly—also known as ecstasy—and phencyclidine (PCP). Luke treated at John Brooks Recovery Center in 2022, participated in an outpatient program in 2007, and attended Narcotics Anonymous meetings.

During the interview, when discussing parenting techniques, Luke endorsed "whooping" or spanking a child as an appropriate disciplinary method. Dr. Lee diagnosed Luke with a personality disorder having antisocial, narcissistic, and paranoid traits. According to Dr. Lee, Luke is at a heightened risk of substance abuse relapse, criminal recidivism, and interpersonal violence, and his prognosis for change is poor. Based on these diagnoses and opinions, Dr. Lee did not recommend reunification as a viable permanency plan for Eric. Dr. Lee recommended Luke undergo a substance abuse evaluation and treatment

---

[6] "'Wet' cigarettes are conventional marijuana cigarettes that have been dipped into various fluids or laced with additional substances." Christopher R. Gilbert, Michael Baram & Nicholas C. Cavarocchi, "Smoking Wet", 40 Tx. Heart Ins. J. 1, at 64 (2013).

and drug testing. Anger management, domestic violence, and parenting programs and counseling were also recommended.

The Division arranged for therapeutic visits between Luke and Eric in April 2018. Luke did not comply with outpatient substance abuse treatment and refused to attend domestic violence counseling.

Logan

In August 2018, Jackie obtained a temporary restraining order against Luke. Jackie was pregnant with Logan. Luke told the Division that he was the father. When Logan was born in October 2018, the Division obtained custody and placed him with his maternal grandparents along with Eric because Luke was not engaged in court-ordered services to reunify with Eric. The Division changed its goal to reunification with Luke for both children.

However, in November 2018, the judge approved a permanency plan to terminate Luke's parental rights to Eric. Luke was non-compliant with evaluations and services and had "scattered" therapeutic visits with Eric, missing a week or two per month. Luke refused to attend Fathers Ending Abuse (FEA), a batterers intervention program.

The Division continued to offer Luke substance abuse treatment, urine screens, psychological and bonding evaluations, counseling, and visitation. In

the first few months of 2019, Luke tested positive for marijuana, alcohol, and oxycodone. The Division also assessed a paternal relative for Logan's placement but determined it was in Logan's best interest to remain with Eric.

On April 4, 2019, Luke was incarcerated at a halfway house for a parole violation. He transferred to Volunteers of America, an inpatient treatment program and was successfully discharged in June 2019. Visitation resumed with both children. Luke refused to provide drug screens when requested by the Division and denied the need for outpatient treatment, claiming he only smoked marijuana medicinally.

In June 2019, Luke was self-employed in his own business. He completed programs focused on cognitive behavioral therapy and rational emotive therapy. He often missed visitation due to work commitments. Luke began living with his girlfriend Teresa and her children.

In July 2019, Dr. Lee conducted updated bonding evaluations with Eric and the maternal grandparents. Eric referred to them as "mommy" and "daddy" and indicated to Dr. Lee that he enjoyed living with them and wished to stay there. Luke did not attend his scheduled evaluations. He completed outpatient substance abuse counseling with Behavioral Crossroads Recovery in September

7

2019. Two months later, his parole officer confirmed he was compliant with parole and tested negative for drug use for the past few months.

Teresa was approved to supervise visits between Luke and the children, but she canceled visits three times in February 2020. On February 16, 2020, Julia allowed the children to have overnight visits with Luke and Teresa. That month, Luke completed his term of parole. The Division discussed a plan of Kinship Legal Guardianship (KLG) for Eric, but Luke rejected the plan as he wanted custody of Eric.

In March 2020, the judge approved a permanency plan for Logan to be reunified with Luke based on his progress with services, and a KLG plan for Eric. Teresa continued to supervise visitation. In May 2020, Teresa gave birth to Eric and Logan's half-brother. Luke was employed at an airport during the COVID-19 pandemic.

On August 17, 2020, the judge transferred legal and physical custody of Eric and Logan to Luke. But a full-time living arrangement was never implemented. The children continued to reside with the maternal grandparents during the week and with Luke on the weekends.

On September 3, 2020, Teresa ejected Luke from the home. Eric told the caseworker "there is a lot of yelling" and that "it hurts his ears." Eventually,

Luke moved back in with Teresa. However, on several occasions, Luke or Teresa contacted Julia requesting her to pick up the children because the couple were fighting, and it was not safe for the boys to be there.

On September 28, 2020, the Division received a referral because Eric had marks and bruises on his face, shoulder, and buttocks after he was hit by Luke. Eric told Julia that Luke hit him several times, and Luke and Teresa also hit each other. Julia took Eric to the hospital for an evaluation and treatment. While in the car on the way to the hospital, Eric told Julia, "I never want to come back here again." Eric was diagnosed with a contusion.

The Division investigated the referral, and the allegations were "substantiated."[7] Based on the findings, Eric was removed from Luke's care and placed with the maternal grandparents. Following a Title 9 hearing, a finding of abuse or neglect was entered against Luke.[8] The judge also found Luke inflicted excessive corporal punishment and negligently caused Eric emotional harm.

---

[7] When interviewed by the Division intake worker, Luke claimed that he and Teresa only "argue as a normal couple would," and he admitted that he physically disciplined Eric. Teresa confirmed domestic violence in the home, and ended her relationship with Luke that day.

[8] We affirmed the trial court's finding in New Jersey Div. of Child Prot. & Permanency v. J.C., W.D. and L.T., No. A-0300-21 (App. Div. Sept. 20, 2022).

A-0917-22

Thereafter, Eric stopped referring to Luke as "daddy Luke" and refused to see, video chat, visit, or even discuss his father. Eric expressed he did not want to visit Luke because he was "scared;" Luke "hurt" him; and "beat [him] real bad."

Eric began trauma-focused cognitive behavioral therapy with Amber Chastine, LSW. He was diagnosed with post-traumatic stress disorder (PTSD). According to Chastine, Eric entered a state of "dysregulation"—an inability to control his emotional responses—when asked about seeing or visiting Luke, which is the body's "flight or fight response" when it is "struggling to calm the nervous system as reactive." Chastine, Julia, Dr. Lee, and the caseworkers all witnessed Eric in this state, explaining that he would curl up into a fetal-like position, hide under his blanket, suck his thumb, tense up, and exhibit a negative change in affect; he even changed his mind about joining a football team when a man in attendance at tryouts resembled Luke. Chastine taught Julia how to co-regulate with Eric. By March 2022, Eric successfully completed therapy by mastering his feelings and finding a trusted caregiver, Julia, as his support and sense of safety.

Luke maintained he did nothing wrong in "beating" Eric. Luke insisted Eric was not afraid of him and blamed the Division and Julia for instilling that

10

notion in him. In October 2020, Luke became irate when Eric did not come to a visit and stated he would cancel future visits with Logan if Eric did not attend. Luke declined to attend a Family Team Meeting with the Division to address these issues.

Eric was evaluated by Dr. Laura Brennan at the Child Protection Center, who recommended trauma-focused therapy. Eric was assessed by Perform Care, which diagnosed PTSD and adjustment disorder with anxiety. Chastine conducted intense, in-home trauma therapy with Eric and opined that Eric should not be compelled to visit with Luke, which the Division enforced. Luke questioned "why a [five] year old is allowed to decide to have a visit or not." Eric refused to visit Luke.

On November 20, 2020, the judge ordered Luke's visitation with Eric to occur at the child's discretion and when determined clinically appropriate by Eric's therapist. Luke was ordered to attend a psychological evaluation, parenting skills training, and random drug screens. That day, Luke told Division supervisor Elizabeth Stuart to "put it on paper" that he was terminating his parental rights: "Don't f***ing call me ever again. Don't call me for no court. Don't have my attorney call me."

A-0917-22

The Division attempted to set up therapeutic video visitation between Luke, Eric, and Logan. Eric stated, "I would be scared" when the contemplated video visits with Luke were explained to him. Eric's therapist advised against the video visits as inappropriate. Luke attended FEA but continued to endorse physical beatings as a parenting strategy even if it caused bruises. Luke did not have stable housing and was staying with friends. He commented that services were a waste of time.

In February 2021, Luke was evaluated by Gregory C. Gambone, Ph.D., who recommended a psychiatric consultation, parenting skills, completing the FEA program, individual therapy, and family therapy if the children were agreeable. Dr. Gambone further recommended that Luke have supervised visitation due to "his risk for uncontrolled anger, his risk for domestic violence, his need of supportive mental health services, his possible need of psychiatric services, and his risk for treatment noncompliance." Luke refused to undergo a psychiatric consultation.

In February 2021, Luke began supervised visits with Logan, which were inconsistent. Eric refused visits with Luke and responded with physical signs of distress when asked about his father.

In June 2021, during a profanity-laden phone call with a Division supervisor, Luke referred to Eric using racial epithets and stated he would continue to "beat his ass." On June 29, 2021, the judge approved the Division's permanency plan of termination of parental rights for Eric and Logan. The Division filed a complaint for guardianship.

Prior to trial, Luke had visits with Logan but not Eric. In September 2021, Luke indicated he was willing to complete services and parent the children utilizing other methods of discipline. The Division scheduled an updated psychological evaluation with Dr. Gambone, but Luke did not attend. In January 2022, Luke advised that he was engaged in FEA but felt domestic violence classes were inappropriate for him because he never committed domestic violence. After February 2022, Luke's visits with Logan were sporadic.

On February 11, 2022, Luke completed an updated psychological evaluation with Dr. Gambone, who was treating him but was discharged due to a "rant" Luke had with the doctor. In his opinion, Dr. Gambone stated that Luke continued to exhibit "untreated psychiatric symptoms including low frustration tolerance, uncontrolled anger, and pervasive feelings of sadness, projected blame, and being unfairly treated."

A-0917-22

In March 2022, Eric concluded therapy with Chastine. She recommended trauma-sensitive parenting education for Luke, and if visitation proceeded with Eric in the future, it should be facilitated by a complex trauma expert. Chastine's final diagnosis of Eric was chronic PTSD and childhood physical abuse.

In April 2022, Dr. Lee conducted updated bonding evaluations with Eric and Logan and their maternal grandparents. Dr. Lee did not conduct a bonding evaluation with Eric and Luke due to Eric's profound distress when asked about seeing his father. Luke refused to attend the bonding evaluation scheduled for Logan. Dr. Lee concluded that Eric and Logan each formed a significant and positive attachment with Julia and Doug. Eric indicated he wanted to remain with them.

In May 2022, Luke was evaluated by Dr. Lee, who noted his demeanor was guarded, irritable, and confrontational. Luke would not disclose who he was living with and was evasive about his domestic violence and illicit drug use history. Dr. Lee diagnosed Luke with an unspecified personality disorder with antisocial, narcissistic and paranoid traits, unspecified disruptive impulse control, and conduct disorder. According to Dr. Lee, Luke could not be an independent caregiver for his children and his prognosis for change remained poor.

A-0917-22

The guardianship trial took place over six non-consecutive days beginning in September 2022. Adoption caseworker Kristina Hamblin, Julia, Doug, Chastine, and Dr. Lee testified on behalf of the Division. Hamblin testified Luke's visitation with Logan remained sporadic and that Luke refused to participate in services and meetings with the Division. Hamblin stated Luke would not allow her to inspect his home.

Julia testified that she met with the Division to discuss the differences between KLG and adoption and that she wanted to adopt Eric and Logan. Doug testified in a similar fashion and added that he felt the children would be safer if adopted because a KLG arrangement can be amended. Chastine testified about the therapy she provided Eric and explained persistently "pushing harder" in questioning a child with PTSD would be unethical and would force Eric into "fight or flight" mode, resulting in adverse mental and physical health consequences.

Dr. Lee testified about the findings in his reports and reiterated his concerns about Luke's maladaptive personality traits, substance abuse history, impulse control problems, unstable housing, his downplaying his domestic violence history, and "interpersonal aggression towards others" as a "means of

15

trying to control and effect influence on others in his environment." Dr. Lee acknowledged Luke's limited participation in services but noted he still required individual therapy, a domestic violence perpetrator program, anger management, and parenting education.

On the final day of trial, Luke's counsel requested that Eric testify, arguing Eric needed to "clarify that he knew what visitation was and how it affected him," which was pertinent to analyzing the third prong of the best interests test. The Division and Law Guardian objected. The judge denied the application finding it was unnecessary to resolve any material issue of fact. Luke did not testify and did not present any witnesses. The Law Guardian did not present any witnesses.

### The Judge's Decision

In a comprehensive oral decision issued on November 3, 2022, the judge found the Division had satisfied the four prongs of the best interests of the child standard under N.J.S.A. 30:4C-15.1 and terminated Luke's parental rights to Eric and Logan. In considering prong one of the statute, the judge found Eric and Logan's health and safety were endangered by Luke's issues with his mental health, domestic violence, the excessive corporal punishment he inflicted on

16

Eric, his failure to participate in services to address the Division's concerns, and the children's prolonged time in foster care.

The judge found prong two was satisfied because of Luke's failure to engage in services, his unwillingness to eliminate the harm, a delay in permanency would add to the harm, and the poor prognosis for reunification noted by Dr. Lee. The judge found Dr. Lee's testimony to be "credible" because he was familiar with the family, aware of information through clinical interviews and psychological testing, and his conclusions were based on his "expertise in clinical psychology with a concentration in child abuse."

The judge likewise found Hamblin's testimony

> credible as to the [Division]'s involvement in trying to work with [Luke] since his release from jail and keeping him aware of what was going on with the case, . . . where things stood with ongoing care for both children, . . . [and] making sure that he was aware certain services that were going to be sought of him to assure that the issues that led to the [Division]'s involvement could be addressed and concerns that they had about [him] would not be left unaddressed by making sure he was exposed and referred to certain services, that there was progress with services, that there was a chance towards reunification.

Regarding prong three, the judge concluded the Division went "above and beyond" in its efforts to satisfy the circumstances that led to the children's placement, and Luke did not meaningfully progress over an extended timeframe.

A-0917-22

The judge found the Division provided reasonable services to Luke and had considered alternative options to the termination of his parental rights. The judge found the maternal grandparents "credible" and "sincere" regarding their commitment to and care for the children. After considering Eric's and Logan's need for permanency and Luke's inability to provide it in the near future, the judge concluded the Division had satisfied its burden under the fourth prong. A memorializing order was entered.

II.

On appeal, Luke argues that the judge erred: in concluding the Division satisfied all four prongs; in concluding that Eric and Logan were harmed by Luke; in failing to consider alternatives to termination of his parental rights; failing to consider KLG as an alternative in violation of the July 2021 amendments; and in denying his motion to allow Eric to testify at trial.

A trial court's findings of fact are binding on appeal if they are "supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Inv. Ins. Co., 65 N.J. 474, 484 (1974)). Especially in the Family Part, a judge's findings should be reviewed under a deferential standard of review. Thieme v. Aucoin-Thieme, 227 N.J. 269, 282-83 (2016) (citing Cesare, 154 N.J. at 413). "We invest the family court with

broad discretion because of its specialized knowledge and experience in matters involving parental relationships and the best interests of children." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 427 (2012). However, our review of a court's interpretation of legal issues is de novo. Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019).

Parents have a "fundamental liberty interest . . . in the care, custody, and management of their child," which "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." Santosky v. Kramer, 455 U.S. 745, 753 (1982). Further, parents maintain this right even when a child is placed in foster care. In re Guardianship of J.C., 129 N.J. 1, 9-10 (1992) (citing Santosky, 455 U.S. 745). The New Jersey Legislature has set forth that "[t]he preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare." In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999) (alteration in original) (quoting N.J.S.A. 30:4C-1(a)).

Still, parental rights are not absolute. Ibid. The State has a "parens patriae responsibility to protect the welfare of children." J.C., 129 N.J at 10. The State may intervene in the parent-child relationship and terminate parental rights if

A-0917-22

the relationship will continue to harm the child.  See In re Guardianship of D.M.H., 161 N.J. 365, 377 (1999).

"The balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard[,]" which is established in N.J.S.A. 30:4C-15(c) and elaborated in N.J.S.A. 30:4C-15.1(a) as four prongs.  K.H.O., 161 N.J. at 347-48. They are:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The Division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

The Division must prove each prong by clear and convincing evidence. N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 611-12 (1986).  The prongs "are not discrete and separate; they relate to and overlap with one another

to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. The court may not make presumptions against parents in termination of parental rights cases, and all doubts which arise "must be resolved against termination of rights." Id. at 347.

## A.

We begin with Luke's contentions regarding the first and second prongs of N.J.S.A. 30:4C-15.1(c). Luke argues the judge erred in finding his mental health, domestic violence incidents, corporal punishment inflicted upon Eric, and housing issues endangered Eric's and Logan's health and safety because he did not abandon his children, and there was no nexus between one instance of corporal punishment and permanent harm to Eric. Luke further asserts prong one was not satisfied because he never inflicted "actual harm" upon Eric or Logan. And because Luke engaged in services, established a timeline of employment, occasionally maintained a residence, denied he had a pattern of domestic violence, abided by the conditions of his parole, and had only one isolated incident of corporal punishment, the Division did not satisfy prong two.

To satisfy the first prong, there must be evidence that the parent caused the child harm. K.H.O., 161 N.J. at 348. While one single harm may be sufficient, "the focus is on the effect of harms arising from the parent-child

relationship over time on the child's health and development." Ibid. Prong two requires there be parental unfitness, which can "be demonstrated that the parent is 'unwilling or unable to eliminate the harm' that has endangered the child's health and development" or "if the parent has failed to provide a 'safe and stable home for the child' and a 'delay in permanent placement' will further harm the child." Id. at 352 (citing N.J.S.A. 30:4C-15.1(a)(2)). While prongs one and two are separate inquiries, they are related and "evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." D.M.H., 161 N.J. at 379.

The Division presented evidence to the judge regarding Luke's incarceration, his physical abuse of Eric, and several domestic violence incidents involving Luke and multiple women. On appeal, Luke contends the judge erred in determining his incarceration constituted abandonment of the children, relying on In re Adoption of Children by L.A.S., 134 N.J. 127, 138 (1993) (emphasizing abandonment as a factor impacting a parent's unfitness). We see no error.

Here, the judge never made an abandonment determination. Rather, Luke's incarceration was only considered in the context of Eric's first year of placement. Moreover, the judge found the damaged relationship between Luke

and Eric stemmed from Luke's mistreatment of Eric after reunification, along with the resulting physical and psychological ramifications. The judge did not find that Luke's incarceration contributed to the negative parental relationship. Because the judge did not determine that Luke abandoned his children, Luke's reliance on L.A.S. is misplaced.

Luke also asserts on appeal that there is no nexus between the infliction of corporal punishment and any resulting permanent damage to Eric. However, prong one does not require actual harm; the mere risk of harm is sufficient. D.M.H., 161 N.J. at 383. The judge correctly found Luke's physical abuse of Eric satisfied prong one because the child was physically injured and suffers from chronic PTSD as a consequence. Additionally, the long gaps between visits after the physical abuse incident negatively impacted Logan.

There was also no error in finding Luke's mental health, domestic violence incidents, and housing issues satisfied prongs one and two. Despite years of involvement with the Division regarding the two children, Luke failed to complete the myriad of services the Division recommended to address its concerns. Moreover, Luke's unwillingness to eliminate harm and provide a safe and stable home for the children underscored the Division's concerns—domestic violence history and excessive corporal punishment of Eric emanating from a

A-0917-22

heated domestic dispute with Teresa—remained unresolved. The Division's concerns, combined with the harm from delaying permanent placement, were supported by the evidence.

Luke's failure to complete the recommended services offered by various professionals endangered Eric's and Logan's health and safety and reflected Luke's unwillingness to eliminate the harm. The judge properly relied on Luke's prior conduct and his non-compliance with previous evaluations and service recommendations in performing his analysis regarding prongs one and two.

B.

Luke also challenges the judge's finding under prong three that the Division make reasonable efforts to reunite the family. The judge misapplied the 2021 KLG amendment. We are unpersuaded in light of the plethora of efforts undertaken by the Division to reunite the family, and we reject Luke's interpretation of the KLG amendment.

To satisfy the third prong, the record must demonstrate that the Family Part made reasonable efforts to reunite the family and "considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). "[A]ssessment of relatives is part of the Division's obligation to consult and cooperate with the parent in developing a plan for appropriate services that reinforce the family

structure." N.J. Div. of Youth & Fam. Servs. v. K.L.W., 419 N.J. Super 568, 583 (App. Div. 2011). "It is the policy of [the Division] to place, whenever possible, children with relatives when those children are removed from the custody of their parents." N.J. Div. of Youth & Fam. Serv. v. K.F., 353 N.J. Super. 623, 636 (App. Div. 2002). "That said, although the [Division] has a statutory duty to evaluate relatives as potential caretakers, there is no presumption favoring the placement of a child with such relatives." N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 82 (App. Div. 2013).

The second part of prong three requires that "the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1. KLG allows a relative to become the child's legal guardian and care for the child until adulthood, without stripping parental rights. P.P., 180 N.J. at 508. The Legislature created this arrangement because it found "that an increasing number of children who cannot safely reside with their parents are in the care of a relative or family friend who does not wish to adopt the child or children." N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 222-23 (2010).

Prior to July 2, 2021, KLG was considered "a more permanent option than foster care when adoption '[was] neither feasible nor likely.'" P.P., 180 N.J. at 512 (emphasis added) (quoting N.J.S.A. 3B:12A-6(d)(3) to (4)). As such, "when

25

a caretaker . . . unequivocally assert[ed] a desire to adopt," the standard to impose a KLG was not satisfied because the party seeking a KLG arrangement would not be able to show that adoption was neither feasible nor likely. N.J. Div. of Youth & Fam. Servs. v. T.I., 423 N.J. Super. 127, 130 (App. Div. 2011). In other words, when permanency through adoption was available to a child, KLG could not be used as a defense to the termination of parental rights. N.J. Div. of Youth & Fam. Servs. v. D.H., 398 N.J. Super. 333, 341 (App. Div. 2008).

On July 2, 2021, however, the Legislature enacted L. 2021, c. 154, which, in part, removed the KLG requirement that adoption be "neither feasible nor likely." P.P., 180 N.J. at 512 (emphasis added) (quoting N.J.S.A. 3B:12A-6(d)(3) to (4)). As such, KLG may now remain a valid defense to the termination of parental rights. D.H., 398 N.J. Super. at 341. Regardless of whether the amendment applies retroactively, a KLG defense requires a valid KLG alternative. Ibid.

Here, the judge properly considered the reasonable efforts made by the Division to provide services to Luke to correct the circumstances which led to the children's placement outside the home. The judge highlighted the Division's efforts began when Luke was incarcerated, and it provided him with referrals

26

for services and informed him about circumstances justifying removal of the children.

On appeal, Luke argues the services offered by the Division did not constitute a reasonable effort because some of the services were substance abuse related, which he deemed a non-issue. But the record is clear that the Division also referred Luke for other services, such as domestic violence programs, which he did not complete. The record also shows the Division made reasonable efforts to accommodate Luke's work schedule for visits and providing for reunification.

The judge properly considered that the maternal grandparents were informed of the option of KLG. The maternal grandparents were apprised of the difference between KLG and adoption and stated they preferred adoption. Luke contends the KLG amendment makes KLG preferable to adoption and changes the best interests analysis in a manner that preserves parental rights.[9] In amending the KLG Act and prong two of the child's best interest standard, the

---

[9] Luke inappropriately cites State v. Gomes, 253 N.J. 6 (2023), to support his argument. However, Gomes dealt with a complete statutory overhaul whereas the KLG amendment made a discrete change. See id. at 35 (cautioning the decision was not "an invitation to disregard statutory language that has been unaltered by new laws").

A-0917-22

Legislature was not foreclosing adoption. Instead, it was emphasizing the need for consideration of kinship caregiving. Here, the Division and the judge properly considered the maternal grandparents' role in providing kinship care to Eric and Logan. However, the evidence presented at the guardianship trial supported the judge's finding that termination of Luke's parental rights was in Eric's and Logan's best interests.

## C.

The Division must prove that "[t]ermination of parental rights will not do more harm than good" under prong four. N.J.S.A. 30:4C-15.1(a)(4). Termination of parental rights inherently involves harm, but the inquiry focuses on "whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [his or] her natural parents than from the permanent disruption of her relationship with [his or] her foster parents." K.H.O., 161 N.J. at 355.

"To satisfy the fourth prong, the State should offer testimony of a well[]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." F.M., 211 N.J. at 453 (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007)). Termination is

appropriate, "even in the absence of evidence showing that [the child] has bonded with [the] foster parents," if the court is presented with "a clear and compelling record warranting the termination of parental rights." N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 623 (App. Div. 2007). "The crux of the fourth statutory subpart is the child's need for a permanent and stable home, along with a defined parent-child relationship." N.J. Div. of Youth and Fam. Servs. v. H.R., 431 N.J. Super. 212, 226 (App. Div. 2013).

In considering prong four, the judge credited the maternal grandparents' testimony regarding the care they have been providing to the children, their level of involvement, and responsiveness to their needs. The judge also emphasized caseworker Hamblin's reports noted Luke's lack of progress and her observations of the children being happy in their maternal grandparents' home. The judge further noted Dr. Lee's opinion that Eric would be at a high risk of suffering severe and enduring harm if his relationship with his maternal grandparents permanently ended, and there was a low risk of suffering severe and enduring harm if his relationship with Luke permanently ended.

In concluding termination of parental rights would not do more harm than good, the judge properly considered the children have resided with their maternal grandparents for most of their lives. The judge also considered Luke's

inability to provide Eric and Logan with a safe and stable home in the foreseeable future, and their need for permanency. N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996) (upholding the trial court's order terminating the mother's parental rights based on her inability to care for her child and her child's need for permanency).

We are also unpersuaded by Luke's argument under the Siblings' Bill of Rights (SBR), N.J.S.A. 9:6B-2.1, that Eric and Logan will be harmed by termination because a relationship with their half-siblings will be severed. The SBR provides that continued sibling contact is subject to the approval of the adoptive parents or KLG. N.J.S.A. 9:6B-4(s). Here, Eric's and Logan's contact with their half-siblings would be subject to the maternal grandparents' approval under either permanency plan.

Luke's reliance on New Jersey Division of Youth & Family Services v. S.S., 187 N.J. 556 (2006) is misguided because that case considered the issue of whether to keep siblings in different resource homes together. In contrast, Eric's and Logan's half-siblings are not in the Division's custody, and therefore, S.S. is not controlling.

D.

Finally, Luke argues the judge abused his discretion in denying his motion to compel Eric to testify. Luke claims he was prejudiced because it was unclear whether Eric understood the purpose of visitation and the legal significance of not attending visits.

Trial courts have broad discretion to preside over cases. N.J. Div. of Youth & Fam. Servs. v. H.B., 375 N.J. Super. 148, 183 (App. Div. 2005). A reviewing court gives substantial deference to a trial judge's evidentiary rulings. Fitzgerald v. Stanley Roberts, Inc., 186 N.J. 286, 319 (2006). A trial judge's ruling to exclude evidence is reviewed under the abuse of discretion standard; such a decision is only reversed if the decision is clearly erroneous. N.J. Div. of Child Prot. & Perm. v. N.T., 445 N.J. Super. 478, 492 (App. Div. 2016).

Rule 5:12-4(b) provides: "The testimony of a child may, in the court's discretion, be taken privately in chambers or under such protective orders as the court may provide." Thus, an in camera interview may be helpful when the child's testimony is necessary to resolve a material factual dispute. N.J. Div. of Youth & Fam. Servs. v. H.B., 375 N.J. Super. 148, 183-84 (App. Div. 2005). "Trial judges have broad discretion in abuse and neglect cases . . . to conduct a

31

private examination of a child." N.J. Div. of Youth & Fam. Servs. v. L.A., 375 N.J. Super. 155, 168 (App. Div. 2003).

We are satisfied that the judge properly exercised his discretion under Rule 5:12-4(b) to decline to perform an interview with Eric. This is not a situation in which a material factual dispute existed to determine any of the four prongs of the best interests test. There was substantial credible evidence in the record to support the judge's findings that the Division made reasonable efforts to arrange visitation between Luke and Eric; credible witnesses testified that Eric did not want any contact with Luke; and the physical and emotional injuries Eric endured as a result of Luke's abuse were unrefuted.

We disagree with Luke that Eric's testimony was required to determine his wishes. Our Court found a child's wishes may be an additional factor to consider in the best interest analysis. N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 228 (2010). However, the child's testimony is not mandated and may be communicated through the Law Guardian. N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 113 (2008). We conclude the factual findings of the judge are fully supported by the record, and the legal conclusions drawn therefrom are unassailable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0917-22